**Robert C. SCHMIDT and Ingrid A. Schmidt, on behalf of themselves and all other persons similarly situated, Plaintiffs,**

v.

**ENERTEC CORPORATION, Energy Resources Corporation, Robert E. Aikman, David L. Baker, Kenneth H. Wanamaker and United States Trust Company of New York, Defendants.**

No. 84 Civ. 5428(RJW).

United States District Court,
S.D. New York.

Dec. 14, 1984.

Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for plaintiffs; Fred T. Isquith, William A. Loeb, Jeffrey G. Smith, New York City, of counsel.

Anderson, Russell, Kill & Olick, P.C., New York City, for defendants Enertec Corp., Energy Resources Corp., Robert E. Aikman, David L. Baker and Kenneth H. Wanamaker; John H. Gross, Lisa D. Levey, C. Kirk Rhein, Jr., New York City, of counsel.

Wofsey, Certilman, Haft, Lebow & Balin, New York City, for defendant U.S. Trust Co. of New York; Evan L. Gordon, New York City, of counsel.

ROBERT J. WARD, District Judge.

This is an action for monetary and injunctive relief brought on behalf of a class

of holders of convertible subordinated debentures for alleged violations of the federal securities laws and for breach of the trust indenture under which the debentures originally were issued. Jurisdiction is alleged under § 322 of the Trust Indenture Act of 1939 ("Trust Indenture Act"), 15 U.S.C. § 77vvv, § 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, and § 22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v. Plaintiffs moved pursuant to Rule 65, Fed.R.Civ.P., for a preliminary injunction staying a tender offer by Enertec Corporation to exchange shares of its preferred stock for certain convertible subordinated debentures issued by Energy Resources Corporation. Plaintiffs alleged that documents relevant to the instant exchange offer fail to disclose material facts in violation of § 14(e) of the Exchange Act, 15 U.S.C. § 78n(e).

On October 29, 1984, the Court held a hearing on the instant motion, after which the Court accepted additional submissions from the parties. Inasmuch as the exchange offer at issue was then due to expire on November 26, 1984, the Court determined it advisable to dispose of plaintiffs' motion by Summary Decision before the expiration of the exchange offer. On November 21, 1984, the Court issued a Summary Decision and Order, which is reproduced in part below, denying plaintiffs' motion for a preliminary injunction. The Opinion that follows sets forth in full the facts relevant to plaintiffs' motion and elaborates upon the Court's reasons for denying that motion.

## SUMMARY DECISION

■ To persuade the Court that preliminary injunctive relief is appropriate in this case, plaintiffs must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v.*

*H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *see also Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981); *Condec Corp. v. Farley*, 573 F.Supp. 1382, 1385 (S.D.N.Y.1983). However, plaintiffs have failed to show irreparable harm; moreover, plaintiffs have not established that the balance of hardships tips decidedly in their favor *or* that it is likely that plaintiffs would succeed on the merits of their § 14(e) claim.

■ Plaintiffs have not substantiated their contention that a finding of a material misstatement or omission in a tender offer prospectus itself establishes irreparable harm. In addition, the Court finds that injunctive relief is not necessary in the instant action because there exist adequate remedies at law for the specific injuries that plaintiffs do allege. Included among such legal remedies are damages in tort or in contract against one or more of the defendants; plaintiffs may also seek rescission of the exchange offer. Stated simply, the exchange offer at issue here will result in neither the liquidation nor merger of any of the corporate entities involved, and therefore this case does not present a situation that will be impossible to "unscramble" or "unravel" once the exchange offer has expired. *Cf. Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86 (E.D.N.Y.), *aff'd*, 665 F.2d 10 (2d Cir.1981) (preliminary injunction granted where tender offer involved takeover of offeree and possible liquidation of segments of offeree's business). Thus, there is no need for preliminary relief to preserve the *status quo*.

■ Even if plaintiffs could demonstrate injury for which monetary damages would not adequately compensate them, however, the Court would hesitate to enjoin the instant exchange offer, for it appears likely that even greater harm would result from the Court's intervention. There is evidence in the record to suggest that, faced with an injunction requiring Enertec to disclose certain representations it purportedly made to the trustee, Enertec might well withdraw its exchange offer rather than make such disclosures. As a result, debentureholders

would lose the opportunity to exchange their debentures for Enertec preferred stock; debentureholders' rights under the indenture to convert their debentures into common stock would once again be in limbo; and debentureholders' prospects of realizing any interest on their investment would be left in serious doubt.

The Court's conclusion that substantially greater harm would result from the issuance of a preliminary injunction in this case, and that therefore the balance of hardships tips *against* plaintiffs, the moving parties here, is buttressed by the fact that the disclosures plaintiffs would have Enertec make are themselves inaccurate and misleading, or, at best, unnecessary. Plaintiffs would have Enertec disclose that the trustee has "agreed" to refrain from enforcing the indenture for the duration of the exchange offer, but there is no evidence that any such agreement was ever reached between the trustee and Enertec. Plaintiffs would further have disclosed Enertec's purported representation to the trustee concerning the right of debentureholders to convert nontendered debentures into Enertec common stock, but the substance of this disclosure is already contained in the exchange offer prospectus. Finally, plaintiffs would have Enertec disclose that Enertec represented to the trustee that, assuming at least sixty-five percent of the debentures were tendered, Enertec would "guarantee payment" of the nontendered debentures. Such a disclosure would be ambiguous, if not inaccurate and misleading, for it could be interpreted as a guarantee of payment of all interest and principal due on the debentures. However, even the trustee has testified that Enertec represented only that it would have sufficient funds to cure the *existing default* on the nontendered debentures if sixty-five percent of those debentures were exchanged.

In addition to failing to establish irreparable harm, then, plaintiffs have also failed to demonstrate a likelihood of success on the merits of their § 14(e) claim. Rather than curing alleged defects in the exchange offer prospectus, the disclosures plaintiffs would have the Court require might themselves mislead debentureholders. It would therefore be particularly improvident of the Court to grant the preliminary injunctive relief plaintiffs seek.

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied. This Summary Decision and Order represents the final disposition of the instant motion by this Court, and therefore constitutes an appealable order within the meaning of Rule 54(a), Fed.R.Civ.P.

## BACKGROUND

The instant action arises from a series of events traceable to a public offering in January 1980 of approximately $8 million of 9% convertible subordinated debentures (the "Debentures"). These Debentures, which are due January 15, 1985, were issued pursuant to an indenture dated January 15, 1980 (the "Indenture") between the issuer, Energy Resources Corporation ("Energy Resources") and the indenture trustee, United States Trust Company of New York (the "Trustee"). Under the terms of the Indenture, the Debentures were to be convertible into Energy Resources common stock; the Debentures are subordinated to certain bank debt of Energy Resources.

### The Parties

Robert C. and Ingrid A. Schmidt, plaintiffs in the instant action, allege that they are holders of nine Debentures: six, plaintiffs allege, they hold as joint tenants, and three are held by Mr. Schmidt individually. Plaintiffs purport to represent two classes: one class consists of all persons who purchased Debentures during the period from July 1, 1982 through November 23, 1983 and were allegedly injured thereby; the other class comprises all Debentureholders who purportedly have been or will be injured by alleged breaches of the terms of the Indenture and alleged federal securities law violations.

Energy Resources, one of the defendants joined in this action, is a Nevada corporation engaged in oil and gas exploration and

production. Another defendant, Enertec Corporation ("Enertec"), formerly Tectonic Energy Corporation ("Tectonic"), is a Delaware corporation involved in acquiring and developing oil and gas properties. Energy Resources is a wholly owned subsidiary of Enertec. Defendants Aikman, Baker and Wanamaker are present or past officers and/or directors of Enertec or Energy Resources.[1] Also named as a defendant in this action is the Trustee.

### The Exchange Offer

Plaintiffs aver that sometime before July 1982, the management of Energy Resources decided to recommend to its stockholders that Energy Resources be liquidated to substantially satisfy its outstanding indebtedness. Under the contemplated plan of liquidation, plaintiffs contend, the Debentures were to be called and paid at a premium over the principal amount or, at the Debentureholders' option, converted into Energy Resources stock at a fixed rate. The plan further provided that all Energy Resources assets other than oil and gas reserves would be sold; the reserves themselves would be placed in a limited partnership, the units of which would be distributed to Energy Resources stockholders. First Amended Complaint ("Amended Complaint") at 7. In January 1983, Energy Resources issued a prospectus and proxy statement that, according to plaintiffs, represented that the limited partnership units Energy Resources stockholders would receive pursuant to the proposed liquidation would have "potentially greater value and rate of distributable income than the common stock [the stockholders then possessed]." *Id.* at 9. Energy Resources stockholders approved the liquidation plan on February 11, 1983.

Sometime between July 1, 1982 and November 23, 1983, plaintiffs claim that they purchased a total of nine debentures at a discount in reliance on the representations of Energy Resources as to the effect of the liquidation plan on the Debentures. Plaintiffs' averred intent was "to obtain a capital gain upon the liquidation." *Id.* at 13; *see also id.* at 2 and 5. In late 1983, however, the Board of Directors of Energy Resources decided to recommend that the liquidation plan be terminated. In February 1984, a second proxy statement was issued to Energy Resources stockholders proposing, according to the Corporate Defendants, "a reverse triangular merger with ENERTEC [sic] (then named Tectonic) and a subsidiary of ENERTEC, which merger would result in Energy Resources becoming the wholly-owned subsidiary of ENERTEC without any change to Energy Resources as a juridical entity." Corporate Defendants' Memorandum in Support of Motion to Dismiss, Transfer or Stay at 5.[2] On March 30, 1984, Energy Resources stockholders approved the proposed merger with Enertec.

Plaintiffs contend, however, that notice of the proposed merger was not "addressed" to the Debentureholders. Amended Complaint at 13.[3] Furthermore, plaintiffs state, the merger proposal provided for the exchange of all outstanding common stock of Energy Resources for Enertec stock without a parallel provision for converting the Debentures into Enertec stock. *Id.* at 13–14. Then, according to plaintiffs, an announcement was made on or about June 21, 1984, that: (1) the Debentures had been delisted for trading on the

---

1. Defendants Enertec, Energy Resources, Aikman, Baker and Wanamaker will hereinafter be referred to collectively as the "Corporate Defendants."

2. The document is actually entitled "Memorandum of Law of Defendants Enertec Corporation, Energy Resources Corporation, Tectonic Energy Corporation, Robert E. Aikman, David L. Baker and Kenneth H. Wanamaker in Support of Their Motion (1) To Dismiss this Action, (2) To Transfer This Action to the United States Dis-

trict Court for the Northern District of Texas, or (3) To Stay this Action" (hereinafter "Corporate Defendants' Memorandum in Support of Motion to Dismiss, Transfer or Stay").

3. It is unclear what plaintiffs mean in averring that notice was not "addressed" to the Debentureholders. For the purpose of deciding the instant motion, however, the Court need not—and does not—attempt to resolve this ambiguity in the amended complaint as it now stands.

American Stock Exchange; (2) neither the interest payment due July 15, 1984 nor future payments due on the Debentures would be made; and (3) the principal on the Debentures would not be repaid. Instead, Enertec would make an exchange offer of unspecified securities for the Debentures. *Id.* at 14.

Enertec subsequently issued a prospectus dated September 6, 1984 (the "Exchange Offer Prospectus" or "Prospectus") offering to exchange seventy-five shares of Enertec Series C preferred stock for each $1,000 principal amount of the Debentures tendered (the "Exchange Offer" or "Offer"). The Introduction to the Prospectus summarizes the terms of the Offer:

Energy Resources is presently in default under its July 15, 1984 obligation to pay interest on the Debentures. Accrued and unpaid interest per $1,000 principal amount of each Debenture is $52 as of August 14, 1984, including $45 which was payable July 15, 1984. Holders of Debentures who tender for exchange will forfeit all rights to accrued but unpaid interest. If less than 65% of the Debentures are tendered for exchange, ENERTEC reserves the right to completely withdraw its offer. While not assuming the obligation of Energy Resources with respect to Debentures not tendered, upon consummation of the Exchange Offer, ENERTEC will permit remaining holders of Debentures to convert such Debentures into ENERTEC common stock at a conversion price of $29.21. Such price is based upon the conversion price of the Debentures into common stock of Energy Resources as increased in order to reflect the number of shares of ENERTEC common stock to which holders of Debentures would have been entitled if they had converted their Debentures immediately prior to ENERTEC's acquisition of Energy Resources.

Prospectus at 1.

A subsequent section of the Prospectus, setting forth the purposes and effects of the Offer, states in part:

The principal purposes of the Exchange Offer are to reduce Energy Resources' semi-annual cash interest obligations and to reduce its current liability for accrued and unpaid interest due under the Debentures. ENERGY RESOURCES IS PRESENTLY IN DEFAULT UNDER ITS OBLIGATION TO PAY INTEREST ON THE DEBENTURES AND, IF LESS THAN 65% OF THE DEBENTURES ARE EXCHANGED, UNDER PRESENT CIRCUMSTANCES, ENERTEC'S WHOLLY-OWNED SUBSIDIARY, ENERGY RESOURCES, WILL NOT HAVE SUFFICIENT CASH FLOW AVAILABLE TO MEET ITS FUTURE OBLIGATIONS UNDER THE DEBENTURES AND OTHER OBLIGATIONS. IN SUCH EVENT, MANAGEMENT OF ENERTEC AND ENERGY RESOURCES BELIEVE THAT THE CHANCES OF ENERGY RESOURCES CONTINUING AS A GOING CONCERN ARE LIMITED.

*Id.* at 7. Later in the Prospectus, there is discussion of the implications of acceptance of the Exchange Offer by holders of *less* than sixty-five percent of the Debentures:

If this Exchange Offer is not timely accepted by holders of at least 65% of the Debentures, ENERTEC will have the right to withdraw its offer. The effect of such a withdrawal would be that the Debentures would continue to be outstanding and Energy Resources would continue to be in default in its obligation to pay interest thereon. Such default would entitle the holders of the Debentures to accelerate Energy Resources' obligation to pay the principal thereof and would constitute a cross-default under Energy Resources' agreements with its lenders. SUCH EVENTS MAY REQUIRE ENERGY RESOURCES TO RECONSIDER THE ADVISABILITY OF ATTEMPTING TO CONTINUE ITS EXISTENCE AS A GOING CONCERN WITHOUT PROTECTION OF APPLICABLE BANKRUPTCY LAWS. UPON FORCED LIQUIDATION OF ENERGY RESOURCES, UNDER CURRENT ECONOMIC CONDITIONS, MANAGEMENT

OF BOTH ENERTEC AND ENERGY RESOURCES BELIEVE THAT LITTLE, IF ANY, PROCEEDS OF FORCED LIQUIDATION AFTER SATISFACTION OF BANK DEBT, WHICH IS SENIOR TO THE DEBENTURES, WOULD BE AVAILABLE TO THE HOLDERS OF DEBENTURES OR OTHER CREDITORS OF ENERGY RESOURCES.

*Id.* at 16–17. The Prospectus states, however, that even if the Exchange Offer is consummated by the tendering to Enertec of sixty-five percent or more of the Debentures, "there is no assurance that the liquidity problems of Energy Resources and ENERTEC will diminish in a degree which is necessary to ensure the continued viability of either or both companies." *Id.* at 17. Thus, under the terms of the Exchange Offer, nontendering Debentureholders will receive accrued interest on the Debentures only "[i]f the Exchange Offer becomes effective and less than 100% of the outstanding Debentures are tendered and accepted, [and] only if and when it has sufficient cash flow." *Id.* at 91. Debentureholders who tender their Debentures pursuant to the Exchange Offer, on the other hand, will receive no accrued interest on their Debentures. *Id.*

The Exchange Offer, originally due to expire on October 10, 1984, was subsequently extended to November 26, 1984. In addition, the Offer was modified to propose an exchange of *ninety-one* shares of Enertec Series C preferred stock for each $1,000 principal amount of Debentures tendered. Letter of Lisa Levey to the Court (dated Oct. 25, 1984).

### The Lawsuit

Plaintiffs allege that on or about June 28, 1984, Mr. Schmidt sent a letter to the Trustee, Energy Resources and Tectonic (now Enertec), demanding prompt cure of any defaults on the Debentures and demanding that the Trustee take action on behalf of the Debentureholders to cure the defaults. The parties do not dispute that the interest on the Debentures due July 15, 1984 was not paid and that to this date the Trustee has not instituted formal legal proceedings against any of the Corporate Defendants.

On July 31, 1984, Schmidt filed suit in this Court against Enertec, Energy Resources, Tectonic, Messrs. Aikman, Baker and Wanamaker, and the Trustee, alleging violations of the Exchange Act and Trust Indenture Act and breach of defendants' obligations under the Indenture. By stipulation filed on October 22, 1984, the complaint was amended to add Ingrid A. Schmidt as a plaintiff, to drop Tectonic as a defendant, and to allege additional violations of the Securities Act and Exchange Act. Both the original and amended complaints seek compensatory damages as well as both preliminary and permanent injunctive relief.

On September 28, 1984, Schmidt filed a motion for partial summary judgment in the instant action. Plaintiff contended in that motion that defendants, by acknowledging in the Exchange Offer Prospectus issued earlier in September that Energy Resources had defaulted on its July 15, 1984 obligation to pay interest to the Debentureholders, had admitted liability under the terms of the Indenture. Malcolm J. Hood, Senior Vice President of the Trustee, responded to plaintiff's motion by filing an affidavit in opposition to plaintiff's motion for partial summary judgment ("Hood Affidavit"). In that affidavit, Hood referred to "several meetings" held between the Trustee and principals of Energy Resources, after Energy Resources' default on the July 15th interest payment, "in an effort to determine an appropriate course of action." Hood Affidavit at 2. Hood explained that

[i]t [had become] apparent during the course of these meetings that Energy Resources did not have the ability to make payment of the interest [to Debentureholders] and that invocation of the default provisions [of the Indenture], including acceleration, would have the anticipated effect of driving the company into a liquidating bankruptcy. Under these conditions the Debentureholders, as subordinated debtors, would most like-

ly receive absolutely nothing for their investment.

*Id.* at 2–3. Hood continued:

It was also proposed to us during the course of these meetings that Enertec Corporation, the owner of all of Energy Resources' outstanding capital stock by reason of a merger consummated in June, 1984, intended to solve the default situation by offering to exchange shares of its Series C preferred stock for the Debentures pursuant to an exchange offer. It was represented to us that if the exchange offer was accepted by 65% of the principal amount of the outstanding Debentures, that the exchange offer would be consummated and would have the effect, [sic] of, among other things, permitting Energy Resources to have a sufficient cash flow to cure its default and would restore to the Debentureholders the right to convert their respective Debentures into shares of common stock of Enertec, a right which had been granted to them pursuant to the terms of the Indenture.

*Id.* at 3.

Shortly after the filing of the Hood Affidavit, plaintiffs filed a motion for a preliminary injunction of the Exchange Offer. In that motion, plaintiffs argued that the Hood Affidavit had disclosed for the first time "material information essential for full consideration by Debentureholders of the tender offer [but not contained in the Prospectus]." Affidavit of Fred Taylor Isquith in Support of Plaintiff's [sic] Motion for a Preliminary Injunction ("Isquith Affidavit") at 4. The alleged omissions of material information from the Exchange Offer Prospectus, according to plaintiffs, constituted violations of § 14(e) of the Exchange Act. Plaintiffs contended that the Exchange Offer should be enjoined until it was disclosed that:

1. If at least 65% of the Debentures are tendered, Energy Resources will have sufficient cash to permit Energy Resources to cure the default in the interest payment and, according to the Tender Offer documents, the default will be cured.

2. The Debentureholders have the right under the Indenture to convert their Debentures into common stock of Enertec, which would be voluntarily "restored" if at least 65% of the Debentures are tendered.

3. The Trustee, based on these representations, has determined not to interfere with the Tender Offer or enforce the Indeture [sic] while the Tender Offer is outstanding.

Plaintiffs' Reply Memorandum of Law in Support of Their Motion for a Preliminary Injunction ("Plaintiffs' Reply Memorandum") at 3.

### The Hearing

The Court held a hearing on plaintiffs' motion for a preliminary injunction on October 29, 1984, at which time the Court heard argument on the motion and took testimony from two witnesses, John C. Russell, a director and Vice Chairman of the Board of Enertec, and Ira Roxland, a member of the law firm representing the Trustee in this action.[4]

Russell testified that in early July he had attended a meeting held at the request of Malcolm Hood on behalf of the Trustee. At that meeting, Hood purportedly had taken the position that, pursuant to the merger of Energy Resources and Enertec, Enertec was required to assume Energy Resources' obligation under the Indenture. In addition, Russell recalled, Hood had contended that by virtue of the Indenture provision allowing conversion of Debentures into Energy Resources common stock, the Debentureholders should be able to convert

---

**4.** By the hearing date, defendants had also submitted a motion to dismiss, transfer or stay the instant action pending completion of the Exchange Offer. The Court informed the parties at the time of the hearing that it would defer consideration of both defendants' motion to dismiss, transfer or stay and plaintiffs' motion for partial summary judgment pending disposition of plaintiffs' preliminary injunction motion. An additional motion by plaintiffs for class certification was not fully submitted at the time of the hearing.

their Debentures into common stock of Enertec. Russell testified that he had advised Hood at that time that "such was not the case since the provisions of the [I]ndenture that he sought to rely on related to situations where Energy Resources would not survive a merger," and since Debentureholders still retained the right to convert their holdings into "an equity position in Energy Resources." Transcript of October 29, 1984 Hearing at 7 ("(T. 7)").

Russell testified further that "[i]n the course of this conversation we touched upon the proposed exchange offer." *Id.* He elaborated:

> I advised Mr. Hood that the financial condition of Energy Resources was such that absent some relief from the burden to service the [D]ebenture debt [,] the substantial bank debt restructure that had just been completed made it unlikely that Energy Resources could continue as a going concern. That if a minimum of [sixty-five] percent of the [D]ebentures were converted to equity based upon pro forma financial models that had been prepared, and assuming that the economic assumptions underlying such model[s] proved to be accurate, Energy Resources could perhaps continue in existence.

(T. 7–8) As a result of the meeting with Hood, Russell testified that Enertec had proceeded with the proposed Exchange Offer. The Exchange Offer Prospectus, Russell explained, included a provision permitting nontendering Debentureholders to convert their Debentures to Enertec common stock, but expressly stated that Enertec was not thereby assuming Energy Resources' obligation with respect to the untendered Debentures. (T. 9)

As to the three "disclosures" proposed by plaintiffs and set forth above, Russell testified that their inclusion in the Exchange Offer Prospectus would itself be inaccurate, or worse, false and misleading. Plaintiffs' first proposed disclosure, to the effect that the tendering of at least sixty-five percent of the Debentures would yield sufficient cash for Energy Resources to cure its default under the Debentures, would be false and misleading, according to Russell, because of "the financial situation of the company and other factors." (T. 9) Russell explained that "if the [E]xchange [O]ffer is consummated there is no assurance that the severe liquidity problems will diminish in a degree which is necessary to insure the continued viability of either or both companies." (T. 10)

Plaintiffs' second proposed disclosure, that Debentureholders have a right to convert their Debentures into Enertec common stock, and that such a right would be "voluntarily restored" if at least sixty-five percent of the Debentures were tendered, would, according to Russell, be both inaccurate and unnecessary. Russell explained that it was Enertec's position that what the Prospectus contemplated was a transfer, not a restoration, of a right of conversion, but that in any event the Prospectus adequately disclosed nontendering Debentureholders' conversion rights under the Exchange Offer. (T. 11–12)

As to plaintiffs' third proffered disclosure, that the Trustee had determined not to interfere with the Exchange Offer or to enforce the Indenture while the Offer was outstanding, Russell testified that a statement by Enertec to that effect would be both false and misleading. Russell elaborated that it was his belief that Enertec had received no communication from the Trustee since receipt of a letter from the Trustee "dated July 15 or 16." (T. 12) In that letter, the Trustee purportedly had stated that if Energy Resources did not cure the existing default on the July interest payment due to the Debentureholders within thirty days, the Trustee would be compelled to consider taking appropriate action. Inasmuch as Enertec had no further knowledge of what the Trustee might do or had determined to do, reasoned Russell, it would be false and misleading for Enertec to "speculate" on the matter. (T. 12)

Ira Roxland, in his testimony at the hearing, stated that he was aware of three meetings between representatives of the Trustee and the Corporate Defendants, and

that both he and Russell had attended the third such meeting. That meeting, which Roxland estimated had taken place "sometime towards the very end of July [or] early August," had been called at the "persistent request" of the Trustee and was also attended by one of Roxland's associates, by Hood, and by "a partner of the firm representing Enertec." (T. 31) The Trustee's concerns at the time, Roxland recalled, were twofold: there remained the matter of "restoration of the conversion feature," and there was by then the additional problem of Energy Resources' failure to pay the July interest due on the Debentures. (T. 31–32) Roxland summarized the discussion that took place:

> To my recollection, in response to an inquiry by Mr. Hood as to what would occur if the [E]xchange [O]ffer ... was successful, Mr. Russell stated [that] they believe they have to secure an exchange with at least [seventy] percent in principal amount of the bonds outstanding in order to achieve the goal which was [to] achieve sufficient cash flow to pay the debt as it came due. Further discussion ensued as to whether [seventy] percent was a reliable number, and it was volunteered that they could make it at [sixty-five] percent.

> . . . .

> Mr. Russell stated that if ... the [E]xchange [O]ffer was successful to the extent that at least [sixty-five] percent of the outstanding [D]ebentures were exchanged for the preferred stock as offered in the [E]xchange [O]ffer, then there would be sufficient cash flow available to cure the default in interest and to pay the bonds as they come due.

(T. 32–33) Roxland further testified that, based on Russell's statements at the meeting, the Trustee had "refrained from taking any action, pending the outcome of the [E]xchange [O]ffer." (T. 33) Roxland sent a confirming letter on the day after the meeting to the effect that "based upon the representations made to [the Trustee] at that meeting, the [T]rustee would take no

action at that point, but would await the outcome of the [E]xchange [O]ffer." (T. 34) According to Roxland, there has been no response to the letter. (T. 49)

In response to a question posed by the Court as to whether the Exchange Offer Prospectus was accurate or whether there were agreements reached during the meetings with Enertec or Energy Resources personnel that had been omitted from the Prospectus, Roxland stated that "[t]he only omission, if there was one, ... centered upon whether there was or was not an express representation that if [sixty-five] percent of the bonds were exchanged in the [E]xchange [O]ffer, then there would be sufficient cash flow to pay the remaining bonds." (T. 38) Roxland asserted that such a representation had been made by Russell, and that "[o]therwise the [T]rustee would have acted in a different course...." (T. 38–39) Roxland elaborated:

> [Russell] stated that if the [E]xchange [O]ffer achieved a threshold of [seventy] percent acceptance, which was subsequently revised to [sixty-five] percent, there would be sufficient cash flow to pay the accrued interest owing to the persons who did not exchange, and that they would continue to pay the debt as it came due, the default being cured by the payment of the accrued interest. No promise was expressly made as to any payments beyond clearing the default. It was made clear that they believed that they would have sufficient cash flow to pay the bonds as they came due. There was a specific commitment to pay the accrued interest, which would eliminate the default situation.

(T. 39) Mr. Russell's "commitment" was not reduced to writing, however, because in Roxland's view it was not "the subject of the normal supplemental debenture," but rather "was the understanding made very clearly by the vice president of [Enertec] to a senior vice president of U.S. Trust with counsel present. [The Trustee] presumed that [Enertec] would honor [its] obligation." (T. 39–40) Roxland explained that he had not advised the Trustee that Rus-

sell's statements would be legally enforceable. Rather, Roxland had advised the Trustee that, "were the condition [of sixty-five percent acceptance of the Exchange Offer] met and the [E]xchange [O]ffer consummated upon the terms set forth, then we would assume that the accrued interest would be paid. If it were not paid, there would be a default situation and the [T]rustee would fulfill its obligations to the [Debentureholders] in accordance with the [I]ndenture at that time." (T. 41–42)

At the hearing, the Court asked Evan Gordon, counsel for the Trustee, to explain why the Trustee had not joined in plaintiffs' motion for a preliminary injunction. Gordon stated the Trustee's position:

> [W]e believe that in the present posture of the situation, that the representations which have in fact been made, not worrying about the fine points of those representations, have satisfied the [T]rustee that it is in the best interests of the [D]ebentureholders that this [E]xchange [O]ffer go forward, that the company attempt to complete that [E]xchange [O]ffer [,] and that any interference with that [E]xchange [O]ffer would in our view seriously compromise the ability of the [D]ebentureholders to receive anything for their investments. And therefore we believe at this point that we should not interfere in any respect with that [E]xchange [O]ffer. And of course in the future, if the circumstances change [,] the [T]rustee's decision will change at that point. But right now we are satisfied and believe this [E]xchange [O]ffer should go forward.

(T. 59–60)

### Post-Hearing Submissions

As a result of the testimony elicited at the October 29th hearing, the Court determined that it would reserve decision on plaintiffs' preliminary injunction motion until after the Trustee had submitted to the Court and to the other parties copies of the "confirming letter" to which Roxland had

**5.** The submission is actually entitled "Plaintiffs' Supplemental Memorandum Regarding Their Motions for a Preliminary Injunction and for a

referred in his testimony, and until after the parties had had an opportunity to make final submissions concerning the instant motion. On October 30, 1984, the Court received from the Trustee's counsel a copy of a letter dated July 30, 1984 and identified by counsel as "the letter referred to in yesterday's hearing." The letter is reproduced as an Appendix to this Decision.

Thereafter, both plaintiffs and Corporate Defendants, in submissions to the Court, addressed the impact of Roxland's July 30th letter on the instant motion. In their submission, plaintiffs proposed a new disclosure based on their reading of the Roxland letter, which they suggested should be set in boldfaced capitals on the front page of the Prospectus. The disclosure would read:

> THE TRUSTEE HAS AGREED NOT TO ENFORCE THE INDENTURE DURING THE PENDENCY OF THE EXCHANGE OFFER BASED UPON REPRESENTATIONS OF ENERTEC AND ENERGY RESOURCES THAT IF 65% IN PRINCIPAL AMOUNT OF DEBENTURES ARE EXCHANGED FOR CONVERTIBLE PREFERRED STOCK, (A) NONEXCHANGING DEBENTUREHOLDERS WILL BE GIVEN THE OPPORTUNITY TO CONVERT DEBENTURES INTO ENERTEC COMMON STOCK, AND (B) ENERTEC WILL GUARANTEE PAYMENT OF THE DEBENTURES.

Plaintiffs' Supplemental Memorandum at 10.[5]

Inasmuch as this most recent proposal incorporates the elements of the three-part disclosure proposed earlier by plaintiffs, *see* Plaintiffs' Reply Memorandum at 3, the Court construes this proposal to supplant those disclosures that plaintiffs had advanced in their previous motion papers. Therefore, the Court construes plaintiffs' motion for a preliminary injunction to be based now on the alleged omission from

[sic] Summary Judgment and Enertec Defendants' Motion to Transfer" (hereinafter "Plaintiffs' Supplemental Memorandum").

the Exchange Offer Prospectus of the information contained in this most recent proposal. The Court limits its consideration of plaintiffs' motion for a preliminary injunction accordingly.

## DISCUSSION

The standard for granting a motion for a preliminary injunction in this Circuit is well established. The movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Recent Second Circuit cases applying the *Jackson Dairy* standard have emphasized the importance of a threshold showing of irreparable harm. *See, e.g., Arthur Guinness & Sons, PLC v. Sterling Publishing Co., Inc.*, 732 F.2d 1095, 1099 (2d Cir.1984); *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983). Irreparable harm is defined in this Circuit as "injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, supra*, 596 F.2d at 72.

■ In the context of tender offers, the Second Circuit has recognized the efficacy of preliminary injunctions to correct defects in filings or to cure inaccurate or misleading statements in a prospectus or proxy materials before the expiration of the tender offer. *See Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir.1969). At the same time, the Circuit has cautioned against the abuses that may be made of the injunctive remedy in these circumstances: "district judges must be vigilant against resort to the courts on trumped up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers." *Id.* On balance, "it is important [for district courts] both to protect stockholders against deceptive exchange offers and not to frustrate the desires of those who wish to

exchange when all the facts are known." *Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc.*, 425 F.2d 842, 844–45 (2d Cir.1970). In the tender offer situation as in other contexts, however, this Circuit has emphasized that "interim injunctive relief is an extraordinary and drastic remedy which should not be routinely granted." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981). Thus, to prevail on a motion to preliminarily enjoin a tender offer, the movant must make the same substantial showing required generally under *Jackson Dairy, supra. See Buffalo Forge, supra*, 638 F.2d at 569; *Seaboard World Airlines, Inc. v. Tiger Int'l, Inc.*, 600 F.2d 355, 359 (2d Cir.1979); *Condec Corp. v. Farley*, 573 F.Supp. 1382, 1385 (S.D.N.Y.1983).

## Section 14(e)

■ Before turning to the merits of plaintiffs' motion, it is appropriate for the Court briefly to summarize the substantive law that plaintiffs contend has been violated in the instant case. Plaintiffs argue that by omitting material information from the Exchange Offer Prospectus, the Corporate Defendants have violated § 14(e) of the Exchange Act. That section, which was passed in 1968 as § 3 of the Williams Act, provides in relevant part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

As the Supreme Court has noted, "[t]he purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information." *Piper v. Chris-*

*Craft Indus., Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). To this end, the Act and corresponding SEC regulations impose substantial disclosure requirements on tender offerors and target management, and the Act provides in § 14(e) a "broad antifraud prohibition." *Id.,* 430 U.S. at 24, 97 S.Ct. at 940. Despite Congress' primary interest in enacting legislation to protect public shareholders confronted with a cash tender offer, the Williams Act has been applied to exchange offers as well. *See, e.g., Broder v. Dane,* 384 F.Supp. 1312 (S.D.N.Y.1974).

■ To establish a violation of § 14(e), plaintiffs must demonstrate not only that there is a misstatement in or omission from the Exchange Offer Prospectus, but that such a misstatement or omission is material. In the context of a lawsuit involving alleged omissions and misstatements in a proxy statement, the Supreme Court articulated the following "general standard of materiality":

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard ... does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Although the alleged Exchange Act violations before the Supreme Court in *TSC Industries* were of § 14(a) and Rules 14a–3 and 14a–9 thereunder, the Second Circuit has found the standard set forth in that case to be appropriate for establishing violations of § 14(e) of

the Act as well. *See Seaboard World Airlines, supra,* 600 F.2d at 360–61; *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140, 1146–47 (2d Cir.1979). The Circuit has emphasized, however, that "[t]he disclosure required by the [Williams] Act is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters." *Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 5–6 (2d Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984).

With this background, the Court turns to plaintiffs' arguments in support of the instant motion. As will be elaborated below, the Court finds that plaintiffs have failed to make a showing of irreparable harm. In fact, plaintiffs cannot even demonstrate that the balance of hardships tips decidedly in their favor. Moreover, plaintiffs have not proven a likelihood of success on the merits of their § 14(e) claim. Having failed to satisfy either of the two necessary prongs of the *Jackson Dairy* standard, plaintiffs' motion for a preliminary injunction must be denied.

### Irreparable Harm

■ As this Court made clear to plaintiffs at the October 29th hearing on the instant motion, without a showing of irreparable injury—injury for which there is no adequate remedy at law—the Court need not even reach the merits of plaintiffs' contention that material information has been omitted from the Exchange Offer Prospectus. Plaintiffs appear to advance two theories of irreparable harm that they argue are applicable in this case. First, they contend that a material omission from a tender offer prospectus itself constitutes irreparable harm under Second Circuit case law. Second, plaintiffs seem to argue in the alternative that they and the class of Debentureholders they seek to represent will suffer some uncompensable loss if the information they claim has been omitted from the Prospectus is not disclosed before the Exchange Offer expires. The Court considers each argument in turn.

Plaintiffs have contended in their motion papers and at oral argument that it is a rule of the Second Circuit "that where there is a material non-disclosure in an ongoing exchange offer ..., the court will suspend the transaction to require the disclosure of the information and permit those who have acted to rescind their exchange...." Plaintiffs' Supplemental Memorandum at 3. Almost without exception, however, the cases cited by plaintiffs as authority for this *"per se rule"* were decided before the Second Circuit clarified its standard for granting preliminary injunctive relief in *Jackson Dairy, supra.* In three of the circuit cases cited, the issuance of preliminary injunctions was affirmed without any independent finding of irreparable harm by the circuit panel. *See Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247 (2d Cir.1973); *Gulf &*

*Western Indus., Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687 (2d Cir.1973); *Butler Aviation, supra.* In a fourth case, *Electronic Specialty, supra,* the Circuit held that, even accepting the § 14(e) violations found by the district court, the court was "well within the bounds of discretion" in *denying* the preliminary injunction plaintiffs had sought. 409 F.2d at 947.[6]

Nor do the few post-*Jackson Dairy* cases cited by plaintiffs advance their position. Only one, *Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86 (E.D.N.Y.), *aff'd*, 665 F.2d 10 (2d Cir.1981), presents an even remotely comparable set of facts. None stands for the proposition that proof of a § 14(e) violation in itself establishes irreparable harm in this Circuit. In *Grumman*, for example, the district court preliminarily

---

**6.** The pre-*Jackson Dairy* district court cases cited by plaintiffs are similarly unpersuasive. In *Broder v. Dane, supra,* and *General Host Corp. v. Triumph American, Inc.*, 359 F.Supp. 749 (S.D. N.Y.1973), tender offers were preliminarily enjoined without any finding of irreparable injury. In *Otis Elevator Co. v. United Technologies Corp.*, 405 F.Supp. 960 (S.D.N.Y.1975), the district court's issuance of a preliminary injunction was premised on the court's findings of probability of success on the merits for the plaintiff-movant and a balance of hardships tipping decidedly in favor of the shareholders of the plaintiff-movant to whom a tender offer had been extended by the defendant. In balancing the relative hardships of the plaintiff target company, the defendant tender offeror, and the target company's shareholders, the *Otis* court concluded that the shareholders would face irreparable harm if preliminary injunctive relief was not granted. The court in *Otis* explicitly held, however, that any hardship to the target company, the plaintiff-movant, would be "minimal." 405 F.Supp. at 973. Moreover, the court's finding of irreparable harm to target shareholders did not follow inexorably from the existence of a material misstatement or omission in the tender offer documents. *What* was omitted from the tender offer in that case was the tender offeror's "highly developed" plan to merge with the target company. *Id.* at 971. In addition, the court noted that the offer had already been modified more than once, and that therefore a completely new offering statement was required to permit shareholders to "divine just what the Offer actually was." *Id.* at 974. Thus, the district court's finding of irreparable harm in *Otis* followed from the court's assessment of the specific facts of that case and not from the application of a

*per se* rule such as that proffered by plaintiffs in the instant action.

Plaintiffs' reliance on *Corenco Corp. v. Schiavone & Sons, Inc.*, 362 F.Supp. 939 (S.D.N.Y.), *aff'd in part and remanded in part,* 488 F.2d 207 (2d Cir.1973), is similarly misplaced. In that case, this Court permanently enjoined a tender offer for shares of stock in a publicly held corporation. This Court concluded in *Corenco* that the plaintiff target company had proved by a preponderance of the evidence that the disputed tender offer violated § 14(e) of the Exchange Act and would result in irreparable harm to the target company and target shareholders if not enjoined. Critical to the result in *Corenco,* however, was this Court's finding that the tender offer documents at issue failed to provide target shareholders with *any* financial information regarding the tender offeror, and that because the offeror was a privately held company, shareholders could not obtain such information elsewhere. *See* 362 F.Supp. at 948. Also relevant to the Court's decision were the following facts: the offeror sought to gain control of the target company; the offeror contemplated a merger with the target; and less than all shares of the target were sought. *Id.* at 950. Thus, this Court's holding that the tender offer at issue violated § 14(e) of the Exchange Act—and that such a violation would result in irreparable injury to target shareholders if not remedied—was grounded in the circumstances of that particular case. *Corenco* does not stand for the proposition that a finding of any material misstatement or omission in a tender offer document relieves the movant for a preliminary injunction of the burden of demonstrating irreparable injury.

enjoined a tender offer upon finding both a likelihood of Clayton Act and Williams Act violations and irreparable harm to the moving party, the plaintiff target company. The *Grumman* court's irreparable harm analysis did not begin and end with a finding of § 14(e) violations, however. In granting plaintiff Grumman's preliminary injunction motion, the district court relied in large part on its conclusion that "the consummation of LTV's tender offer would seriously disrupt Grumman's business [,] posing irreparable injury to Grumman [and to] the nation and public at large." *Id.* at 105. The court referred in particular to LTV's "tentative" plans to liquidate the nonaerospace segments of Grumman, *id.,* and noted that "a lessening of competition [in the aerospace industry as a result of the takeover of Grumman by LTV] might very well affect the quality and price of weapons sold to the United States Navy" with "adverse consequences for the United States national defense." *Id.* at 106. Thus, the preliminary injunction issued in *Grumman* was justified in part by the district court's finding that specifically articulable, irreparable injury would befall Grumman if the impending LTV takeover were allowed to proceed. The likelihood of Williams Act violations in conjunction with the takeover attempt did not in itself support the preliminary injunction issued in that case.[7]

*In re W.T. Grant Co.,* Fed.Sec.L.Rep. (CCH) ¶ 97,636 (Bankr.S.D.N.Y. Sept. 16, 1980), another post-*Jackson Dairy* case cited by plaintiffs in a footnote, does not even present an analogous factual situation. The preliminary injunction in that case was granted by a federal bankruptcy judge in the context of a proceeding brought pursuant to Chapter XI, § 322 of the Bankruptcy Act, former 11 U.S.C. § 722. The injunction prevented five debentureholders from sending a letter to other debentureholders that would have solicited opposition to an offer of settlement of their claims. No tender offer was involved in that case; no § 14(e) violation was alleged. Rather, the bankruptcy court construed the letter as a proxy solicitation governed by § 14(a) of the Exchange Act and Rule 14a–9 thereunder. Finding material misstatements and omissions in the proposed solicitation, and concluding that both the debentureholders and the indenture trustee would be irreparably harmed by its dissemination, the bankruptcy court enjoined the sending of the letter.

Not only is *W.T. Grant* factually inapposite, but it also does not illustrate plaintiffs' *"per se* rule." The bankruptcy judge in *Grant* enjoined the dissemination of a materially misleading proxy solicitation, but not upon finding that misstatements or omissions in the proposed solicitation would in themselves irreparably harm the debentureholders in that action. Rather, the court evaluated the impact that the communication most likely would have on the debentureholders and the trustee. The bankruptcy court specifically found that the debentureholders would be irreparably harmed if the solicitation were disseminated because the debentureholders might oppose the one-time settlement offer in reliance on the communication and recover little or nothing from the bankrupt on their own. Moreover, the court found that the indenture trustee would be harmed by dissemination of the letter because he would thereby "be prevented from effectuating his role of equitably administering the proceeds of the estate to Debentureholders and other creditors." *Id.* at 98,406. Thus, the bankruptcy judge in *Grant,* like the district judge in *Grumman,* granted preliminary injunctive relief upon finding evi-

---

7. Not only does *Grumman not* support plaintiffs' contention that a § 14(e) violation in itself constitutes irreparable harm, but that case may easily be distinguished from the instant action on its facts. In *Grumman,* as the district court there found, the tender offer at issue contemplated a takeover with far-reaching economic consequences. In contrast, the Exchange Offer before the Court in the instant case involves no merger or liquidation of any kind, but only an exchange of securities between a corporation and debentureholders of one of its wholly owned subsidiaries. Thus, plaintiffs in this action could not allege the type of specific irreparable injury found to confront the plaintiff in *Grumman.*

dence of specific irreparable harm that would result if an injunction did not issue.[8]

Plaintiffs' citations to *Chromalloy Amer. Corp. v. Sun Chem. Corp.,* 474 F.Supp. 1341 (E.D.Mo.1979), *aff'd,* 611 F.2d 240 (8th Cir.1979), and *Joseph v. Shell Oil Co.,* Civ. Action No. 7450 (Del.Ch. July 9, 1984), are similarly inapt. In *Chromalloy,* a Missouri district court case, the plaintiff's allegation of § 14(e) violations in conjunction with a disputed tender offer were found insubstantial. A preliminary injunction was issued in that case, but the underlying violation was of § 13(d) of the Exchange Act, 15 U.S.C. § 78m(d). *Joseph,* a Delaware Chancery Court case, involved breach of a corporation's fiduciary duty of disclosure to its investment banker under Delaware law. The Court is at a loss to discern how either case illustrates plaintiffs' Second Circuit "rule" that a § 14(e) violation itself constitutes irreparable harm.

In sum, plaintiffs have utterly failed to demonstrate that, as a matter of law in this Circuit, a material omission or misstatement in a tender offer prospectus itself satisfies the requirement that a movant for preliminary injunctive relief make a showing of irreparable harm.[9] The language of Second Circuit cases does suggest, however, that irreparable harm may be established where the disputed tender or exchange offer would result in a situation that would later be difficult to "unscram-

ble" or "unravel." *See, e.g., Seaboard World Airlines, supra,* 600 F.2d at 365; *Gulf & Western Indus., supra,* 476 F.2d at 698.

Such a situation was presented in *Grumman Corp. v. LTV Corp., supra,* in which the district court found that the tender offeror contemplated a takeover of the target company and possible liquidation of entire segments of the target's operations. Had the tender offer in *Grumman* continued without interruption and the takeover plan been implemented, the district court would have been hard-pressed to attempt to "unscramble" the situation at a later date. In contrast, the Second Circuit in *Seaboard World Airlines, supra,* noted that the plaintiff target company in that case had failed to demonstrate irreparable injury in view of the fact that target shares acquired through the tender offer at issue had been placed in a blind trust and therefore were not threatened by "prompt commingling or sale of the target's assets by the acquiring company." 600 F.2d at 365. The Circuit in *Seaboard* was similarly unimpressed by the argument that the disruption and demoralization resulting from the tender offer constituted irreparable harm. *Id.*

Thus, the Second Circuit's observation in *Sonesta Int'l Hotels, supra,* that "preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of

---

**8.** It is somewhat ironic that plaintiffs cite *W.T. Grant* in support of their position, for the posture of that case more closely resembles defendants' version of the facts in the instant action. In *Grant,* as the Corporate Defendants argue is the case here, a small number of debentureholders sought to have disclosed information that was itself materially false and misleading. As in this case, the trustee in *Grant* did not join in the minority debentureholders' effort, but took the position that the offer at issue (a settlement offer in *Grant,* the Exchange Offer in the instant case) should go forward.

**9.** Plaintiffs' *"per se* rule" is particularly incongruous in view of this Circuit's "continuing admonishments that interim injunctive relief is an extraordinary and drastic remedy which should not be routinely granted," *Buffalo Forge, supra,* 638 F.2d at 569. The logical extension of plain-

tiffs' proposition, that a § 14(e) violation itself proves irreparable harm, is that any omission or misstatement in a tender offer prospectus that could be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," *TSC Industries, supra,* 426 U.S. at 449, 96 S.Ct. at 2132, would justify preliminarily enjoining the offer. Certainly the nature and extent of a particular omission or misstatement, and the structure and ramifications of a particular tender offer, may create a situation in which preliminary injunctive relief is necessary to prevent irremediable injury. In such a setting, however, the movant for injunctive relief should be able to identify the particular irreparable injury or injuries that will result if the disputed tender offer is not enjoined.

the [Exchange] Act," 483 F.2d at 250, cannot be read in a vacuum. The Circuit premised that remark in *Sonesta* on an assumption: that the general standard for granting preliminary injunctive relief had already been met. Under *Jackson Dairy, supra,* that standard requires that the moving party make an independent showing of irreparable injury. Therefore, plaintiffs in the instant action must point to one or more "unravelable" or otherwise irreparable harms that will result if the instant Exchange Offer is not enjoined to permit the disclosures plaintiffs propose. Stated differently, plaintiffs must identify specific injuries resulting from a continuation of the Exchange Offer in its present form for which a monetary award or other legal remedy would not adequately compensate them. *See Condec Corp., supra,* 573 F.Supp. at 1385; *see also Buffalo Forge, supra,* 638 F.2d at 569.

When pressed at the October 29th hearing to identify the specific irreparable harm that would follow from a continuation of the instant Exchange Offer, plaintiffs argued that Debentureholders who tender their Debentures will forego accrued interest payments on the Debentures as well as the opportunity to convert the Debentures into Enertec common stock and "will receive in return [Enertec] preferred stock of doubtful value on which Enertec has indicated it will probably not pay cash dividends for at least three years." Plaintiffs' Supplemental Memorandum at 8. Even assuming plaintiffs' evaluation of the Exchange Offer is correct, however, plaintiffs

themselves have argued that what is being given up is "real cash," or more accurately, "financial rights." (T. 23) Plaintiffs thus acknowledge that their prophecied losses may readily be compensated by money damages.[10]

Nonetheless, plaintiffs contend that money damages would be "difficult to quantify" were plaintiffs to prove that there had been § 14(e) violations in connection with the Exchange Offer after the Offer had expired. Plaintiffs' Supplemental Memorandum at 10. Plaintiffs admit, however, that the instant Exchange Offer does not effect a merger in which one or more of the defendants would be liquidated or merged and thereby become immune from liability upon completion of the Offer. Rather, all defendants presently joined in this action, including the Trustee, will remain in existence after the Exchange Offer has expired and may be pursued at that time—jointly or severally—for alleged securities law violations or other breaches in connection with the Offer. Plaintiffs' suggestion that damages would be "difficult to quantify" and thus are not a realistic remedy is belied by plaintiffs' original and amended complaints, which themselves seek in part compensatory damages for claims arising from the same set of facts alleged here. Having originally sought monetary relief from this Court, it is nothing less than disingenuous of plaintiffs now to assert that damages are not an adequate remedy for their averred losses.[11]

**10.** Also raised at the October 29th hearing was the possibility of a subsequent claim for rescission of the Exchange Offer. Plaintiffs have not questioned the availability of a rescission remedy, but rather have contended that "rescission is not a practicable alternative." Plaintiffs' Supplemental Memorandum at 10. Plaintiffs appear to argue that rescission would not be an alternative for those Debentureholders who exchange their Debentures for Enertec preferred stock pursuant to the Exchange Offer and then promptly dispose of the Enertec stock; these individuals, say plaintiffs, would then have nothing to rescind. Assuming the applicable law of remedies supports plaintiffs' position, such individuals could still presumably bring an action for damages against one or more of the

defendants. On the other hand, those Debentureholders who exchange their Debentures for Enertec preferred stock and retain the stock would presumably have a choice of remedies, including both damages and rescission.

**11.** The Court does not hereby hold that one or more particular remedies are available to plaintiffs for the injuries they allege will result from continuation of the Exchange Offer. Plaintiffs simply have not demonstrated that adequate remedies at law do *not* exist for their purported losses. In fact, plaintiffs do not dispute the availability of legal remedies, but rather their adequacy. *See* Plaintiffs' Supplemental Memorandum at 8–10.

At the October 29th hearing, plaintiffs also argued that failure to disclose the actions taken by the Trustee would cause irreparable harm because "in order for the [D]ebentureholders to act under the [I]ndenture, enforce their rights, force the [T]rustee to act, it is necessary ... that they be told the truth not only about what the [T]rustee has been told, but why the [T]rustee has not acted." (T. 20) The Court must strain to ascertain the "rights" to which plaintiffs refer, however. Both at the hearing and in a subsequent submission to the Court, plaintiffs referred generally to "certain circumstances [in which the Indenture requires] that the [D]ebentureholders act as a group, sometimes [twenty-five] percent, sometimes [seventy-five] percent." Id.; see also Plaintiffs' Supplemental Memorandum at 9. But plaintiffs stated both at the hearing and in their supplemental memorandum that the Indenture provisions to which plaintiffs had alluded were "not of significance to any of the motions pending before the Court." Id.; see also T. 20. The Court is hard-pressed to see how it may properly evaluate the harms plaintiffs allege will flow from the failure of Debentureholders to take group action pursuant to their alleged rights under the Indenture, when the relevant terms of the Indenture are not even before the Court.[12]

Plaintiffs' allegation of irreparable harm to the Debentureholders from failure to exercise certain alleged rights under the Indenture troubles the Court in another respect. The injury plaintiffs allege appears more properly traceable to the actions or inactions of the Trustee than to a failure by Enertec adequately to disclose the terms of its Exchange Offer. Plaintiffs' argument here is not that disclosure of the Trustee's recent activities through the Exchange Offer Prospectus will more fully inform the Debentureholders of the terms of the Exchange Offer, but rather that such a disclosure may mobilize the Debentureholders to take group action against the Trustee. Plaintiffs as much as admit that their underlying purpose is to "compel[] the Trustee to sue the Enertec Defendants." Plaintiffs' Supplemental Memorandum at 9.

The Exchange Offer Prospectus may indeed present plaintiffs with a convenient and effective vehicle for communicating with their fellow Debentureholders. But a showing of convenience to plaintiffs does not justify the issuance of a preliminary injunction in this case. Plaintiffs still must demonstrate irreparable injury traceable to the § 14(e) violations they allege. The injury posited by plaintiffs, if proven, would not arise from the Corporate Defendant's failure accurately to disclose the terms and conditions of the Exchange Offer, but from the failure of Debentureholders to exercise certain contractual rights they possess independent of the Offer. Thus, the injury alleged would not arise from a violation of § 14(e), and would not support an injunction of the Exchange Offer premised on violations of that section.

In sum, plaintiffs have failed to demonstrate that there is no adequate remedy at law for the injury they claim will result from continuation of the Exchange Offer without additional disclosures by the Corporate Defendants. Even if plaintiffs could make a more convincing showing of uncompensable injury, however, the Court would hesitate to enjoin the Exchange Offer on plaintiffs' terms because of the like-

---

12. The "truth" about the Trustee's activities that plaintiffs would have disclosed is also unclear. As is discussed infra, the Trustee has refrained from taking legal action against the Corporate Defendants pending completion of the Exchange Offer. The Trustee's decision appears to have been motivated at least in part by representations allegedly made to the Trustee by Enertec. The substance and significance of such representations, however, are still adamantly disputed by the Trustee and the Corporate Defendants. Inasmuch as the Court finds it unnecessary to resolve this dispute in order to decide the instant motion, the Court makes no finding at this time as to which party's version of the facts is more credible. Thus, the "truth" plaintiffs would have disclosed is far from that. The Trustee's decision to refrain for the time being from taking legal action against the Corporate Defendants is undisputed; the circumstances surrounding that decision are as yet unestablished.

lihood that far greater harm would result from the injunction plaintiffs seek.

### Balance of Hardships

The Corporate Defendants have maintained that the disclosures sought by plaintiffs would themselves be inaccurate or misleading, and might expose Enertec to liability under the federal securities laws if reasonable Debentureholders were to rely on the proposed disclosures. *See* Corporate Defendants' Memorandum in Opposition at 13–14 and n. 6.[13] Whether or not the Corporate Defendants' fears of potential liability are well-founded, counsel for Enertec has maintained that Enertec will make no "representation" or "guarantee" that the default on nontendered Debentures will be cured if a certain percentage of Debentures are exchanged. (T. 48) Yet the disclosure of just such a purported representation is a critical element of the preliminary injunctive relief plaintiffs seek. *See infra.* The Court therefore is persuaded that, if forced to choose between making the disclosure that Enertec has heretofore refused to make voluntarily and withdrawing the Exchange Offer, Enertec might well withdraw the Offer.

Such a withdrawal would threaten Energy Resources with irreparable harm in view of the Corporate Defendants' representation that "if the Exchange Offer is not successfully concluded ..., the prospects of Energy Resources continuing to operate as a going concern are limited." Corporate Defendants' Memorandum in Opposition at 28. The Prospectus itself states that without an exchange of at least sixty-five percent of the Debentures, Energy Resources will have insufficient cash flow to meet its obligations and may therefore be forced into liquidation. *See* Prospectus at 2.

Without question, the forced liquidation of Energy Resources would irreparably injure that corporation, for Energy Resources would thereby cease to exist.

Such a liquidation would also injure the parent corporation, Enertec, for any rights Enertec possesses to recover its equity in the subsidiary would undoubtedly be subordinate to the claims of Energy Resources' outside creditors. 3A J.W. Moore & L.P. King, *Collier on Bankruptcy* ¶ 63.06[4] (14th ed. 1975); 15A H.S. Schlagman, *Fletcher Cyclopedia of the Law of Private Corporations* § 7417 (rev.perm.ed.1981).

The liquidation of Energy Resources would injure the Debentureholders as well. Inasmuch as the Debentures are themselves subordinated to Energy Resources' existing bank debt, the likelihood that Debentureholders would recover even close to the full value of their investment upon Energy Resources' liquidation is extremely small. The Exchange Offer Prospectus in fact states that "LITTLE, IF ANY, PROCEEDS OF FORCED LIQUIDATION AFTER SATISFACTION OF BANK DEBT WOULD BE AVAILABLE TO THE HOLDERS OF DEBENTURES OR OTHER CREDITORS OF ENERGY RESOURCES." Prospectus at 2 (upper case in original). Debentureholders might be able to diminish their losses by pursuing Enertec for damages based on allegations of Exchange Act or Indenture Act violations such as those alleged in the instant action, but success on such claims would by no means be assured and the damages recoverable would not necessarily compensate Debentureholders for the full value of their investment.

Even if withdrawal of the Exchange Offer did not itself force Energy Resources into liquidation, the Court is satisfied that Debentureholders would be injured nonetheless by the loss of an opportunity to improve the value of their investment by taking advantage of the terms of the Offer. Those Debentureholders who would have tendered would lose the opportunity to exchange their Debentures for Enertec preferred stock. The value of such stock is as

---

**13.** The memorandum is actually entitled "Memorandum of Law of Defendants Enertec Corporation, Energy Resources Corporation, Robert E. Aikman, David L. Baker and Kenneth H. Wanamaker in Opposition to Plaintiffs' Motion for a Preliminary Injunction" (hereinafter "Corporate Defendants' Memorandum in Opposition").

yet undetermined, but the issuer, Enertec, would at least appear to be a solvent enterprise. Those Debentureholders who would not have tendered would lose the right now provided by the terms of the Offer to convert their Debentures into Enertec common stock.[14] What Debentureholders would retain if the Exchange Offer were withdrawn are Debentures on which Energy Resources is already in default and has declared it will remain in default. According to Enertec, "[s]uch default would entitle the holders of the Debentures to accelerate Energy Resources' obligation to pay the principal thereof," but such acceleration might induce Energy Resources to seek the protection of the bankruptcy laws. Prospectus at 16–17 (upper case in original). As discussed above, the Debentureholders would recover little if any of their investment if Energy Resources were to liquidate.

The Court is persuaded, therefore, that irreparable harm might indeed result from the issuance of the injunction plaintiffs seek. It is likely that Enertec would withdraw its Exchange Offer rather than make the disclosures plaintiffs propose, and there is no assurance that a similar offer would be made in the future. At worst, withdrawal of the Offer would force Energy Resources into bankruptcy, out of which Debentureholders would recover little or nothing. At best, Energy Resources would remain in default on its Debentures, but any attempt by Debentureholders to accelerate the obligation might itself force Energy Resources into bankruptcy. The Court therefore finds ample support in the record for the Trustee's determination that "it is in the best interests of the [D]ebentureholders that [the] [E]xchange [O]ffer go forward, ... and that any interference with [the] [E]xchange [O]ffer would ... seriously compromise the ability of the [D]ebentureholders to receive anything for their investments." (T. 59)

The potential harm that could result from issuance of the injunction plaintiffs seek is considerable and, in this Court's estimation, outweighs the harm plaintiffs allege would flow if injunctive relief were denied. Thus, not only have plaintiffs failed to demonstrate irreparable injury to themselves, but they have not even established that the "balance of hardships tip[s] decidedly toward the part[ies] requesting the preliminary relief," *Jackson Dairy, supra*, 596 F.2d at 72. Rather, the Court finds that the balance of hardships tips decidedly *against* the moving parties in the instant case.

### Likelihood of Success on the Merits

Because plaintiffs have failed to make the necessary showing of irreparable harm, it is unnecessary for the Court to reach the merits of plaintiffs' contention that the Exchange Offer Prospectus omits material information in violation of § 14(e) of the Exchange Act. The Court merely highlights the weaknesses of plaintiffs' § 14(e) claim to further emphasize the inadvisability of the preliminary injunction plaintiffs seek.

Plaintiffs' Supplemental Memorandum, their most recent submission relevant to the instant motion, appears at first glance to request a different sort of disclosure than that which plaintiffs had earlier proposed, *see* Plaintiffs' Reply Memorandum at 3. The focus of plaintiffs' most recently proffered disclosure appears to be on the Trustee's purported "agreement" not to enforce the Indenture; the representations allegedly made to the Trustee by Enertec are mentioned only indirectly. On closer inspection, however, it becomes apparent that plaintiffs have not altered their original position, which is that the Debentureholders should be informed of the substance of the representations allegedly made by Enertec. The "truth" of those representations, plaintiffs continue to maintain, is that Debentureholders "who did not tender ... will have the default [on their

**14.** Although the Trustee has maintained that such a conversion right exists under the terms of the Indenture by virtue of Enertec's merger with Energy Resources, the Corporate Defendants argue that, independent of the Exchange

Offer, the Debentureholders have no right to convert their Debentures into Enertec stock. Which side would prevail on the issue is unclear; in the meantime, Debentureholders' conversion rights would remain in limbo.

Debentures] cured, full rights to convert [their Debentures to Enertec common stock] and, apparently, a guaranty of payment from Enertec." Plaintiffs' Supplemental Memorandum at 8. Plaintiffs' strategy is transparent: if Enertec's alleged representations to the Trustee are disclosed, Debentureholders "who do not tender may ... be able to use the representation of the Enertec Defendants to demonstrate that Enertec is responsible for the payment of interest and principal." *Id.* at 10. Thus, plaintiffs not only seek to disclose the Trustee's purported "agreement" not to enforce the Indenture during the pendency of the Exchange Offer, but also would disclose and have Debentureholders rely on representations of Enertec on which the Trustee allegedly based its decision.

■■■ Having established the scope of the disclosure plaintiffs continue to seek, the Court turns to the issues of whether the Prospectus contains misleading statements or omissions, and whether any such misstatements or omissions are material. The Court does not need to reach the issue of materiality, however, because it finds that the disclosures plaintiffs propose would themselves be inaccurate and misleading, or at best unnecessary.

Plaintiffs would first have disclosed that "THE TRUSTEE HAS *AGREED* NOT TO ENFORCE THE INDENTURE...." Plaintiffs' Supplemental Memorandum at 10 (emphasis added). Yet the Court is aware of no "agreement" between the Trustee and any other party with respect to the Trustee's enforcement of the Indenture during the pendency of the Exchange Offer. At best, the "confirming letter" that came to light at the October 29th hearing evidences an independent decision by the Trustee to take no action at the time to enforce the Indenture. *See* Appendix. As Roxland testified at the hearing, the Trustee received no response to its letter from any of the Corporate Defendants. (T. 49) Thus, plaintiffs' proposed disclosure, to the extent that it suggests the existence of an "agreement" between the Trustee and one or more of the Corporate Defendants, is inaccurate and perhaps misleading.

Second, the disclosure of a representation made by Enertec and Energy Resources that if sixty-five percent of the Debentures are tendered, "NONEXCHANGING DEBENTUREHOLDERS WILL BE GIVEN THE OPPORTUNITY TO CONVERT DEBENTURES INTO ENERTEC COMMON STOCK," Plaintiffs' Supplemental Memorandum at 10, is unnecessary. The Prospectus already informs Debentureholders that "upon consummation of the Exchange Offer [which Debentureholders can infer from other statements made in the Prospectus will occur if sixty-five percent of Debentures are tendered], ENERTEC will permit remaining holders of Debentures to convert such Debentures into ENERTEC common stock...." Prospectus at 1.

Third, the disclosure of a representation purportedly made by the Corporate Defendants to the Trustee that upon the tendering of sixty-five percent of the Debentures to Enertec, "ENERTEC WILL GUARANTEE PAYMENT OF THE DEBENTURES," Plaintiffs' Supplemental Memorandum at 10, is at best ambiguous, at worst inaccurate and misleading. The October 29th hearing revealed that the Trustee and Enertec vigorously dispute the substance of the representations made by Russell to Roxland at their meeting in July. Roxland testified that "[n]o promise was expressly made as to any payments beyond clearing the default. It was made clear that they *believed* that they would have sufficient cash flow to pay the bonds as they came due." (T. 39) (emphasis added) In contrast, Russell contended that not even this limited "promise" was made, but only that "assuming that [certain] economic assumptions ... proved to be accurate, Energy Resources could perhaps continue in existence." (T. 8) Plaintiffs' proposed disclosure of a representation that Enertec would "guarantee payment of the Debentures," however, could reasonably be interpreted by a Debentureholder to suggest that Enertec had promised full payment of interest on the Debentures rather than merely the payment of accrued interest to cure the existing default. Even Roxland's testimony does not support the making of

such a representation by Enertec. To disclose that such a representation had been made—or to permit Debentureholders to infer from an ambiguous disclosure that such a representation had been made—would be seriously misleading.

In sum, then, what plaintiffs would have the Court require Enertec to disclose are not "material objective factual matters," *Data Probe Acquisition Corp., supra,* 722 F.2d at 6, but matters that are either already adequately disclosed in the Prospectus, subject to dispute, or unsubstantiated by the record. Inasmuch as plaintiffs' proffered disclosures would not cure any defect that may exist in the Prospectus in its present form, but might in fact mislead or confuse Debentureholders, it would be particularly inappropriate for the Court to enjoin the Exchange Offer so that such "disclosures" could be made.

Thus, not only have plaintiffs failed to establish the requisite irreparable harm, but they also have not demonstrated a likelihood of success on the merits of their § 14(e) claim. *See Jackson Dairy, supra.* Plaintiffs therefore are not entitled to the preliminary injunction they seek.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied.

It is so ordered.

### APPENDIX

July 30, 1984

C. Kirk Rhein, Jr., Esq.
Anderson Russell Kill & Olick, P.C.
666 Third Avenue
New York, New York 10017

  RE: *Energy Resources Corporation 9% Convertible Subordinated Debentures due 1995*

Dear Mr. Rhein:

As a follow-up to our meeting of last Thursday, it remains the Trustee's firm position that the merger transaction by which, among other matters, the Debentureholders were denied on-going conversion rights into shares of ENERTEC Common Stock is in contravention with the terms of the Indenture governing the issuance of the Debentures.

Nevertheless, based upon your client's representation, predicated upon at least 70% in principal amount of Debentureholders electing to exchange their respective Debentures for Convertible Preferred Stock, that non-exchanging Debentureholders will be accorded both conversion rights into ENERTEC Common Stock and an ENERTEC guaranty of payment, the Trustee will take no action at this time to enforce the Indenture.

We advise your client, however, that should the definitive Exchange Offer fail to achieve the minimum exchange level required to implement same and no action is taken thereafter to remedy what the Trustee regards as a material breach of the Indenture, appropriate relief on the Debentureholders' behalf will be promptly and vigorously sought in the Courts.

    Very truly yours,
    Ira I. Roxland

IIR:eic
cc: Malcolm J. Hood