802 F.2d 62
 Fed. Sec. L. Rep. P 92,939
MACFADDEN HOLDINGS, INC. and Macfadden Acquisition Corp.,
Plaintiffs-Appellees,
v.
JB ACQUISITION CORP., BJ Holding Corp., and Reliance Capital
Group, L.P., Defendants-Appellants.
John Blair & Company, Intervenor-Appellant.
 Nos. 1745, 1746, Dockets 86-7639, 86-7641.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 15, 1986.
Decided Oct. 6, 1986.
 
 Louis A. Craco, New York City (Willkie Farr & Gallagher, New York City, Richard L. Posen, Brian E. O'Connor and Joel M. Litvin, New York City, of counsel), for plaintiffs-appellees.
 Arthur L. Liman, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Max Gitter and Francis M. Holozubiec, Blair C. Fensterstock and Andrew B. Donnellan, Jr., New York City, of counsel), for defendants-appellants.
 Paul C. Saunders, New York City (Cravath, Swaine & Moore, New York City, of counsel), for intervenor-appellant.
 Before PRATT and MINER, Circuit Judges, RE, Chief Judge, U.S. Court of International Trade, sitting by designation.
 MINER, Circuit Judge:
 
 
 1
 JB Acquisition Corp., BJ Holding Corp., and Reliance Capital Group, L.P. (collectively "Reliance") and Macfadden Holdings Inc. and Macfadden Acquisition Corp. (collectively "Macfadden") were competing tender offerors for control of John Blair & Co. ("Blair"), a communications company whose assets included several television and radio stations. After Reliance successfully acquired approximately ninety percent of the outstanding shares of Blair common stock, the United States District Court for the Southern District of New York (Kram, J.) held that Reliance had misrepresented, or omitted, certain material facts in its tender offer, in violation of section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e) (1982) and SEC Rule 14d-6(d), 17 C.F.R. Sec. 240.14d-6(d) (1985). The district court entered summary judgment in Macfadden's favor and ordered Reliance to release all Blair shares tendered to it pursuant to its offer. 641 F.Supp. 454. After hearing argument by counsel, we concluded that Reliance did not violate federal securities laws in connection with its tender offer and reversed the summary judgment of the district court by summary order, dated August 15, 1986, 801 F.2d 391, indicating that this formal opinion would follow.
 
 I. BACKGROUND
 
 2
 The efforts to obtain control of Blair began on April 22, 1986, when Macfadden commenced a tender offer for all outstanding shares of Blair common stock, at twenty-five dollars per share. Blair's Board of Directors, believing this offer inadequate, began searching for a "white knight," a company acceptable to the Blair Board and willing to make a better offer. As a result of the efforts of Blair's investment bankers, Reliance entered into a merger agreement with Blair on June 2nd ("Merger Agreement"). Thereafter, in accordance with the Merger Agreement, Reliance commenced a tender offer for Blair shares on June 5, 1986 ("June 5th Offer").
 
 
 3
 In the June 5th Offer, Reliance offered to pay twenty-seven dollars per share in cash for eight million shares ("front-end"). The remaining Blair shares were to be acquired in a subsequent merger for twelve percent junior subordinated discount debentures, having a principal amount equal to twenty-seven dollars, plus imputed interest ("back-end"). In addition, the stock of ADVO Systems, Inc., a Blair subsidiary, would be distributed as a dividend to all Blair shareholders. Under SEC Exchange Act Rule 14d-7, 17 C.F.R. Sec. 240.14d-7, Reliance could begin to purchase or "take down" any shares tendered to it after 12:00 midnight, July 2, 1986. If Reliance were able to purchase a majority of the outstanding shares of Blair common stock, it would consummate the deal and gain control of Blair. The cover of the June 5th Offer included a statement in bold-faced, capital letters that the offer and proration period would expire at midnight, July 2, 1986, unless extended, and that withdrawal rights would expire at midnight, June 25, 1986.
 
 
 4
 The June 5th Offer contained several conditions precedent to consummation of the deal. One of these conditions required Reliance to obtain approval from the Federal Communications Commission ("FCC") of the voting trust arrangement described in an application filed on FCC Form 316 ("Short Form"). Short Form approval was required because Blair's television and radio stations were licensed under the Federal Communications Act of 1934, 47 U.S.C. Secs. 151 et seq. (1982), which prohibits the transfer of a broadcast license without FCC approval, 47 U.S.C. Sec. 310(d). Ordinarily, an applicant for transfer of a broadcast license must follow the "Long Form" application procedures mandated in 47 U.S.C. Sec. 309. The FCC, however, has implemented a special procedure governing license transfer in the context of tender offers for broadcast companies. See Policy Statement on Tender Offers and Proxy Contests, 59 Rad.Reg.2d (P & F) 1536 (1986). An offeror may make a Short Form application to the FCC for authorization to have a voting trusteeship operate the broadcasting company pending receipt of Long Form approval. Once the Short Form application is approved, the trusteeship controls the stock of the broadcast company in the period between consummation of the tender offer and final FCC approval.
 
 
 5
 Reliance filed its Short Form application on June 6, 1986. On June 12th, Macfadden, having terminated its first offer after acquiring about 400,000 shares, commenced a new tender offer for eight million Blair shares at thirty dollars per share in cash; it proposed to purchase the remaining shares in a subsequent merger by issuing junior preferred stock having a face value of thirty dollars per share.
 
 
 6
 On June 19th, Reliance amended its June 5th Offer as follows:
 
 
 7
 1. The cash portion of the offer (front-end) was increased to thirty-one dollars per share for seven million shares;
 
 
 8
 2. The back-end would receive subordinated debentures in the principal amount of $20.75, plus imputed interest, and the ADVO stock as a dividend (the front-end would no longer receive the ADVO stock dividend); and
 
 
 9
 3. Withdrawal rights were extended from June 25th to midnight, July 2, 1986.
 
 
 10
 On June 26th, Macfadden amended its second offer to provide that it would purchase up to seven million shares of Blair common stock for thirty-two dollars per share, to be followed by a proposed merger in which the remaining Blair shares would be converted into junior preferred stock with a stated value of thirty-two dollars per share.
 
 
 11
 On July 2nd, Reliance issued a press release, announcing that it had extended the expiration date, proration period, and withdrawal rights under its offer to midnight, July 3, 1986. Also on the 2nd, Macfadden announced that if at least 4.6 million shares were tendered into its offer by 4:00 p.m. on the 3rd, Macfadden would not tender its Blair stock into the Reliance offer. The following day, the Blair Board of Directors announced that if Reliance obtained a majority of Blair shares in its tender offer, Blair would declare a $1.50 cash dividend payable to the owners of those shares not purchased by Reliance in the front-end of the tender offer. Blair also announced that Macfadden could not consummate its tender offer so long as the FCC's stay of its order approving the Macfadden Short Form application remained in effect. On the afternoon of the 3rd, Macfadden announced that it was considering the possibility of improving its offer once again. At 4:30 p.m., on the same day, Reliance announced that if it did not receive a majority of Blair shares by midnight, it would extend its offer until after the weekend, i.e., to July 7, 1986. In the eight hours between 4:00 p.m. and midnight on July 3rd, more than seven million Blair shares were tendered to Reliance (including over one million shares tendered by Macfadden). Thus, by midnight, a total of more than ten million Blair shares (approximately ninety percent of the outstanding shares) had been tendered to Reliance. Accordingly, at midnight, July 3, 1986, the Reliance offer, proration period, and withdrawal rights were allowed to expire. On July 7, 1986, Reliance announced that it had accepted for payment, subject to FCC Short Form approval, seven million of the ten million shares that had been tendered, on a pro rata basis.[1]
 
 
 12
 This event, however, did not put an end to the bidding war for control of Blair. On July 9th, Macfadden stated that it proposed to pay a two dollar cash dividend in its back-end offer. Then, on July 11th, Macfadden filed the instant complaint against Reliance in the district court. At the end of the day on July 16th, the FCC rejected Reliance's Short Form application because the proposed trustees were not sufficiently independent. On July 18th, Reliance submitted a new application to the FCC, nominating former Senator Eugene McCarthy as the sole voting trustee. On July 30, 1986, the FCC approved Reliance's new Short Form application. To permit Macfadden to seek a stay of the FCC's ruling in the D.C. Circuit, however, the approval was made effective 5:30 p.m., Friday, August 1, 1986; the D.C. Circuit denied the application for a stay on August 1.
 
 
 13
 In its complaint in the district court, Macfadden alleged that Reliance had represented that it would not terminate its offer, permit withdrawal rights to expire, or accept Blair shares for payment until after the condition that it receive FCC Short Form approval was either satisfied or waived. According to Macfadden, these statements were material misrepresentations or nondisclosures, because Reliance in fact terminated its offer, allowed withdrawal rights to expire, and accepted Blair shares for payment before it received FCC Short Form approval. Macfadden claimed that these misrepresentations and nondisclosures violated section 14(e) of the Williams Act and SEC Rule 14d-6(d).
 
 
 14
 On the evening of July 31st, the district court orally granted Macfadden's motion for summary judgment, ruling that Reliance had violated section 14(e) of the Williams Act and SEC Rule 14d-6(d) by accepting Blair shares for payment subject to FCC Short Form approval. Macfadden Holdings, Inc. v. JB Acquisition Corp., 641 F.Supp. 454 (S.D.N.Y.1986). The court, however, did not determine whether Reliance also misrepresented that it would not allow its offer or shareholders' withdrawal rights to expire before FCC approval was obtained. Rather, the district court found that "[r]egardless of when the offer expired or when withdrawal rights were terminated," Reliance had "said it would not accept shares for payment prior to receipt of FCC short form approval." 641 F.Supp. at 463-464. In short, the district court found that Reliance's representations led Blair's stockholders to believe that they had a "no risk proposition" when they tendered into the Reliance offer. If Reliance obtained Short Form approval, Reliance would accept shares for payment and, subject only to delays occasioned by the proration process, pay for the tendered shares. If, however, FCC approval was not forthcoming, and a higher offer came along, the tendering shareholders would be free to withdraw their shares and tender them into the other offer. Accordingly, finding the normal remedy of disclosure and extension of withdrawal rights to be inadequate since Reliance had already received FCC Short Form approval, the court ordered Reliance to release all Blair shares in its possession that were tendered pursuant to the June 5th Offer. The district court's order and the statutory withdrawal rights, which would have reopened on August 3, 1986, were stayed pending this appeal.
 
 
 15
 On appeal, Reliance asserts two arguments. First, it contends that the district court's analysis is incorrect because it did not represent that it would not accept shares for payment until FCC approval was obtained, and that, even if it did, such a representation was not material. Second, in response to Macfadden's argument below that Reliance misrepresented that it would not close its offer or extinguish withdrawal rights until after FCC approval was obtained, Reliance asserts that it did not make any such representations.
 
 II. DISCUSSION
 
 16
 Section 14(e) of the Williams Act provides, in pertinent part:
 
 
 17
 It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading ... in connection with any tender offer ... or any solicitation of security holders in opposition to or in favor of any such offer....
 
 
 18
 15 U.S.C. Sec. 78n(e). In adopting the Williams Act, Congress was concerned primarily with protecting the shareholder of a company that is the target of a takeover bid.[2] Recognizing that such a shareholder is required to make an investment decision and to do so within a short period of time in response to a tender offer, Congress expressly recognized in the Williams Act the principle of full and fair disclosure. Congress's effort to protect the target's shareholders, however, was not intended to remove all pressure or uncertainty from this inherently volatile market situation or to interfere with the forces of the free marketplace. The function of the Williams Act was to place pertinent information before the shareholders of the target company and then to allow the shareholders to decide for themselves. Schreiber v. Burlington Northern, Inc., 472 U.S. 1, ---- - ----, 105 S.Ct. 2458, 2462-2464, 86 L.Ed.2d 1, 7-10 (1985). As we previously have stated:
 
 
 19
 Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management [or competing tender offerors] to protect [their] own interests against the desires and welfare of the stockholders. These considerations bear on the kind of judgment to be applied in testing conduct--of both sides--and also on the issue of materiality.
 
 
 20
 Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir.1969).
 
 
 21
 Moreover, just as Congress intended the Williams Act to favor neither side in a takeover contest, so too must the courts exercise care so as not to impede the informed choice of the shareholders of a target company. Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir.1985). The instant case starkly illustrates the power of the courts to nullify the shareholders' selection. More than ninety percent of the outstanding shares of Blair common stock were tendered to Reliance. If the district court's decision is left undisturbed, the preference of the overwhelming majority of Blair's shareholders will be frustrated. This is not to say that the courts should hesitate to enforce the Act's disclosure provisions through appropriate relief when a violation has occurred. Rather, it is merely meant to remind the district courts to "guard against improvident or precipitous use of remedies that may have the effect of favoring one side or the other in a takeover battle when allegations of violation of the Act, often made in the heat of the contest, may not be substantiated." Id. Indeed, "district judges must be vigilant against resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers." Electronic Specialty, 409 F.2d at 947.
 
 
 22
 Here, there is no allegation that Blair shareholders were wrongfully induced or misled to accept Reliance's offer for reasons relating to its merits. Macfadden argues instead that Blair shareholders, who tendered their shares into the Reliance offer at a time when they believed it to be the best offer, were led to believe that they retained the right to withdraw their shares and tender them into a higher offer should one emerge before Reliance obtained FCC approval of its Short Form application.
 
 
 23
 In order to understand adequately Macfadden's position, it is necessary to discuss in some detail the tender offer materials. The cover of the June 5th offer stated: "THE OFFER AND PRORATION PERIOD WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON WEDNESDAY, JULY 2, 1986, UNLESS THE OFFER IS EXTENDED. WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON WEDNESDAY, JUNE 25, 1986."
 
 
 24
 Section one of the offer, under the heading "Expiration Date," further explains:
 
 
 25
 The term "Expiration Date" shall mean 12:00 Midnight, New York City time, on Wednesday, July 2, 1986, unless the Purchaser shall have extended the period of time for which the Offer is open, in which event "Expiration Date" shall mean the latest time and date at which the Offer, as so extended by the Purchaser, shall expire. Pursuant to the Merger Agreement, the Purchaser has agreed to keep the Offer open for a period equal to at least the lesser of 60 days and the date on which all conditions precedent to the obligations of the Purchaser to purchase any Shares in the Offer are satisfied or waived....
 
 
 26
 June 5th Offer at 3. There is no dispute that FCC Short Form approval, finally secured on July 30, 1986 within the sixty-day period described, was one of the conditions precedent referred to in this section. Indeed, both the June 5th Offer and the June 19th Supplement state:
 
 
 27
 Upon the terms and subject to the conditions of the Offer, the Purchaser will accept and pay for Shares validly tendered on or prior to the Expiration Date and not properly withdrawn as permitted by Section 3 of this Offer, as soon as practicable after the latest of (i) the Expiration Date, (ii) the satisfaction or waiver of the conditions of the Offer, including the approval or consent of the FCC to the voting trust arrangement set forth in the application to be filed on FCC Form 316 (the "Short Form Approval") (see Sections 15 and 16)....
 
 
 28
 June 5th Offer at 3; see June 19th Supplement at 3. Similarly, section 15 of the June 5th Offer, and section 5 of the June 19th Supplement state:
 
 
 29
 Certain Conditions of the Offer.
 
 
 30
 Notwithstanding any other provision of the Offer, the Purchaser [Reliance] shall not be obligated to purchase any Shares if ... (b) the FCC shall not have approved or consented to the voting trust arrangement set forth in the application to be filed on FCC Form 316 (Short Form Approval)....
 
 
 31
 June 5th Offer at 20; June 19th Supplement at 4. According to Macfadden, the sentence referring to the Merger Agreement provision, whereby Reliance agreed that it would keep the offer open for 60 days or until all conditions precedent were satisfied or waived, led Blair shareholders to believe that the offer would be kept open until the FCC approved its Short Form application.
 
 
 32
 Macfadden also argues that as long as the Reliance offer remained open, tendering shareholders would retain their withdrawal rights, because the June 19th Supplement extended the withdrawal rights from June 25th to "Wednesday, July 2, 1986, at 12:00 Midnight, New York City time, unless the Offer is extended." June 19th Supplement at 3 (emphasis added). By virtue of this term of the offer, the withdrawal period was made coterminous with the offer.
 
 
 33
 Finally, Macfadden points out that Reliance, having told Blair's stockholders that FCC approval was a condition precedent to its obligation to accept and pay for shares tendered into its offer, then represented that it would take expeditious action to satisfy that condition. In its offer, Reliance represented:
 
 
 34
 The Purchaser intends expeditiously to seek the required FCC approval for transfer of control of such licenses.... To enable the Purchaser to accept Shares for payment within the time frame contemplated by the Offer (see Section 2), the Purchaser will seek prompt FCC Short Form Approval of the Voting Trust Agreement....
 
 
 35
 June 5th Offer at 22.
 
 
 36
 Reading these several statements together, Macfadden asserts that Blair shareholders were led to believe that, absent FCC approval, Reliance (1) would not permit its offer to expire until 60 days had passed or the condition of FCC approval was waived; (2) would not permit withdrawal rights to expire; and (3) would not accept shares for payment. Contrary to Macfadden's position, we believe that a plain reading of Reliance's tender offer materials demonstrates that Reliance did not represent that it would hold its offer and the withdrawal rights open and forego accepting shares for payment until after FCC approval was obtained.
 
 A. Acceptance of Shares for Payment
 
 37
 As stated above, the district court concluded that, regardless of when the offer and withdrawal rights were to expire, Reliance had represented that it would not accept shares for payment until after FCC approval was obtained. The key sentence supporting the district court's conclusion is located at page 22 of the June 5th Offer: "To enable the Purchaser to accept Shares for payment ... the Purchaser will seek prompt FCC Short Form Approval...." The district court found that this sentence "clearly implie[d] that Reliance could not accept shares for payment until the FCC granted short form approval." 641 F.Supp. at 463.
 
 
 38
 According to the district court, Reliance represented that there would be prompt payment upon acceptance, subject only to the delays occasioned by proration. The court read the offer to mean that, after acceptance:
 
 
 39
 The only possible delay in payment Reliance disclosed [in] its tender offers would be due to prorating shares if more than 8 million shares were tendered. [Reliance Offer at 4]. Reliance did not inform shareholders there would be any delay in payment while it awaited FCC approval. Finally, Reliance stated that any shares not accepted for payment would be returned promptly. Id. at 5. Thus, once Reliance accepted shares for payment, the only delay shareholders expected would be due to proration. Reliance did not say it would delay payment while awaiting FCC approval.
 
 
 40
 641 F.Supp. at 464 (emphasis added).
 
 
 41
 We disagree. The Reliance offer, in several places, distinguished between "acceptance for payment" and "payment." In addition, the offer clearly stated that actual payment would be delayed until after receipt of FCC approval. At page 22 of the June 5th Offer, Reliance informed shareholders that "[a]ny obligation of the Purchaser to pay for Shares tendered pursuant to the Offer shall be conditioned on receipt of the Short Form Approval." At page 4 of the Offer, Reliance informed shareholders that Reliance "expressly reserve[d] the right, in its sole discretion, to delay the acceptance for payment of, and the payment for, Shares in order to comply in whole or in part with any applicable laws." On the next page, the offer stated that tendered shares may be retained if Reliance "is unable to accept for payment or pay for Shares pursuant to the Offer for any reason...." June 5th Offer at 5 (emphasis added). The offer also stated: "There can be no assurance that ... [regulatory] approval ... would be obtained without substantial conditions ... which may cause the Purchaser to delay the acceptance for payment or any payment for Shares...." June 5th Offer at 21 (emphasis added). Finally, the offer stated: "Any obligation of the Purchaser to pay for Shares tendered pursuant to the Offer shall be conditioned on receipt of the Short Form Approval." June 5th Offer at 22 (emphasis added).
 
 
 42
 Thus, contrary to the apparent import of the sentence focused on by the district court and Macfadden, the offer did state, in clear and unambiguous terms, that payment might be delayed by the absence of FCC Short Form approval. Indeed, the one sentence supporting Macfadden's position is not so clearly at odds with these other statements, since it merely states that Reliance will seek FCC Short Form approval in order to enable it to accept shares for payment within the contemplated time frame. Accordingly, we hold that the district court erred in finding that Reliance had represented it would not accept shares for payment until after receipt of FCC Short Form approval. More important, we conclude that none of Reliance's statements can fairly be read as a representation that Reliance would not accept shares for payment until after the FCC approved its Short Form application.
 
 
 43
 Moreover, if this alleged misrepresentation were the only basis for finding that Reliance violated the Williams Act, we still would be compelled to reverse the summary judgment granted in Macfadden's favor. Even assuming that Reliance had made such a representation, a proposition we do not accept, that representation could not have been material to any tendering shareholder unless that shareholder also believed that he retained his right to withdraw his shares from the Reliance offer pending FCC approval.[3] Since we hold, as discussed more fully below, that Reliance did not represent that withdrawal rights were to remain open, it would not have mattered to any shareholder that Reliance had accepted his shares for payment, so long as the deal was consummated by August 3, 1986, when his withdrawal rights were scheduled to reopen according to the June 5th Offer. This result obtains, because a tendering shareholder, on July 3rd, would have known that he was tying up his shares in the Reliance deal until August 3rd.
 
 
 44
 The district court found that Reliance had represented that it would promptly return shares that had not been accepted for payment. Consequently, the court concluded that if a shareholder tendered and FCC Short Form approval was not forthcoming, Reliance, not being able to accept the shares for payment, would promptly return them. The shareholders then would have the opportunity to tender to a higher bid if one were made. We disagree with this analysis for a number of reasons. First, we believe that Reliance could lawfully accept Blair shares for payment without prior FCC approval. This view is in accord with the SEC's position. See Interpretative Release Relating to Tender Offer Rules, Exchange Act Release No. 34-16623, 3 Fed.Sec.L.Rep. (CCH) p 24,284I, at 17,758 (Mar. 5, 1980) ("Nothing in the rules prohibits offers under the terms of which the acceptance for payment is conditioned upon fulfillment of a condition requiring regulatory approval," but "regulatory approvals may be required before a bidder will be permitted to actually purchase shares....").
 
 
 45
 Moreover, we believe the statement regarding the prompt return of shares, which is included in a section dealing with proration, is merely intended to advise shareholders that shares which are not accepted and paid for because of proration will be returned promptly. Indeed, it would make little sense to permit Reliance to accept shares for payment before actual payment, but require it to return the shares promptly after accepting them. Finally, the offer itself states that shares may be retained if Reliance is "delayed in its ... payment for any Shares ... for any reason...." June 5th Offer at 5.
 
 
 46
 B. Expiration Date of Withdrawal Rights and Offer
 
 
 47
 The district court did not determine whether Reliance represented that it would not close its offer or allow withdrawal rights to expire before the FCC approved its Short Form application. In light of our rejection of the basis of the district court's opinion, however, we must resolve the question, and we believe that Reliance did not so represent its intentions. First, the cover of both the June 5th Offer and the June 19th Supplement stated, in bold-faced, capital letters, that the offer and the withdrawal rights would expire on a certain, definite date. On July 2nd, Reliance issued a press release extending the expiration date, proration period and withdrawal period for its tender offer to "12:00 Midnight, New York City time, on Thursday, July 3, 1986." July 2nd Press Release. The press release also stated that as of that time, 425,000 shares of Blair common stock had been tendered pursuant to the offer. Thus, the apparent reason for the extension of the offer was because an insufficient number of shares had been tendered into the Reliance offer by July 2nd.
 
 
 48
 On July 3, 1986, Reliance announced in another press release that if it did not receive a majority of the Blair shares in its tender offer, which was to expire at midnight that night, it would extend the offer to midnight, New York City time on July 7, 1986.[4] In addition, Reliance stated that if it did not receive a majority of Blair shares by midnight, it would also extend withdrawal rights under its offer to midnight on the 7th. The obvious import of this press release was that the Reliance offer and the withdrawal period would close at 12:00 midnight on the 3rd if a majority of Blair shares were tendered into its offer. Between 4:00 p.m. and midnight, more than seven million Blair shares were tendered into the Reliance offer and thus, according to the clear and unambiguous representations of Reliance, the offer and the withdrawal rights were allowed to expire.
 
 
 49
 The foundation for Macfadden's position is a single sentence in the June 5th Offer, viz., the sentence referring to the Merger Agreement between Blair and Reliance, whereby Reliance promised to keep the offer open for sixty days or until, among other things, FCC Short Form approval was either obtained or waived. This sentence, on its face, is not a promise to keep the offer open until the FCC approved the Short Form application, because it provides that Reliance may waive any condition. Accordingly, even if FCC Short Form approval were a condition to Reliance's accepting shares for payment, Reliance, in its discretion, could waive that condition. Although no waiver occurred here, the possibility of such a waiver was clear and thus no reasonable shareholder could have read the statement in the offer as an unconditional promise to extend the offer until the FCC approved Reliance's voting trust proposal. Moreover, no shareholder could have understood the statement to be a promise of any sort to the shareholders, since it merely referred to a promise that had been made by Reliance to Blair in the Merger Agreement.
 
 
 50
 More significantly, the sentence referring to the Merger Agreement provision was contained only in the June 5th Offer. The June 19th Supplement and the press releases issued on July 2nd and 3rd stated only that the offer and the withdrawal period would expire on a fixed date. Indeed, from the very inception of Reliance's offer, the shareholders were informed that the offer and the withdrawal rights would expire at an exact time on a specific, known date. The statement informing the shareholders of this date was printed on the cover of the June 5th Offer in bold-faced, capital letters. When Reliance amended its offer, it again informed the shareholders of the expiration date of the offer and the withdrawal period by printing the exact time and date--midnight, July 2, 1986--on the cover of the June 19th Supplement in bold-faced, capital letters. Similarly, the press releases referred only to a specific time and date. Certainly, the shareholders, including Macfadden, understood the July 3rd Press Release to mean that the offer and withdrawal period would expire that night if Reliance obtained a majority of Blair's shares, as was evidenced by the tendering into the Reliance offer of more than seven million shares in an eight hour period.
 
 
 51
 In sum, we conclude that Reliance consistently represented that the offer and withdrawal period would expire at a fixed time on a specific date. Although Macfadden was able to discover some statements in the offering materials that arguably were inconsistent with these clear representations, we are not persuaded that any shareholder could possibly have been led to believe that the offer and withdrawal period would not close at midnight, July 3, 1986. As we previously have stated: "We are ... not inclined to subject every tender offer to a nit-picking judicial scrutiny which will in the long run injure shareholders by preventing them from taking advantage of favorable offers." Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1, 5 (2d Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984). Since Reliance did not misrepresent or omit to state any material facts in connection with its tender offer, we hold that it did not violate the federal securities law. Accordingly, we reverse the summary judgment of the district court, vacate the injunction, and remand the case with directions to enter judgment in favor of Reliance.
 
 
 52
 Macfadden also claimed that Reliance violated SEC Rule 14d-6(d), and the district court agreed, noting that the violation provided an alternative basis for its holding. See 641 F.Supp. at 466. That rule provides: "A material change in the information published or sent or given to security holders shall be promptly disclosed to security holders in additional tender offer materials." 17 C.F.R. Sec. 240.14d-6(d); see Cardiff Acquisition, Inc. v. Hatch, 751 F.2d 917, 921 (8th Cir.1984). In light of our conclusion that Reliance did not misrepresent or omit to state its intentions regarding when the offer and withdrawal rights would expire and when shares would be accepted, we hold that the district court erred in finding that Reliance violated rule 14d-6(d).
 
 III. CONCLUSION
 
 53
 For the foregoing reasons, we have by order of August 15, 1986, reversed the order appealed from, vacated the injunction, and dismissed the complaint.
 
 
 
 [1]
 The proration procedure is required by Sec. 14(d)(6) of the Williams Act, 15 U.S.C. Sec. 78n(d)(6) (1982). That section and certain rules promulgated thereunder require a tender offeror, making an offer for less than all of the outstanding shares of a class, to purchase shares tendered within specified time periods on a pro rata basis and at a uniform price. See Pryor v. United States Steel Corp., 794 F.2d 52, 54 (2d Cir.1986)
 
 
 [2]
 The district court found that Macfadden had standing as a tender offeror to seek an injunction for a violation of Sec. 14(e). 641 F.Supp. at 462 (citing Mobil Corp. v. Marathon Oil Co., 669 F.2d 366, 372 (6th Cir.1981), cert. denied, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); Humana, Inc. v. American Medicorp, Inc., 445 F.Supp. 613, 616 (S.D.N.Y.1977)). Whether Macfadden's ability to maintain this action is deemed a question of standing or, more properly, one of whether Sec. 14(e) implicitly creates a private right of action under which a tender offeror may seek relief against rivals in a takeover contest, it need not be decided here. Cf. Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1, 4 n. 2 (2d Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984). Since Macfadden, in addition to its role as a competing tender offeror, was the owner of some 1.2 million shares of Blair common stock, it clearly may seek to enjoin an alleged violation of the Act
 
 
 [3]
 The standard for materiality in the context of a tender offer is the same as in a proxy contest. Prudent Real Estate Trust v. Johncamp Realty, Inc., 599 F.2d 1140, 1146-48 (2d Cir.1979). Under Sec. 14(e), a misstatement or omission is "material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to accept the tender offer. Id. at 1146 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); see Seaboard World Airlines, Inc. v. Tiger International, Inc., 600 F.2d 355, 360-61 (2d Cir.1979); Bromberg, The Securities Law of Tender Offers, 15 N.Y.L.F. 459, 470 (1969)
 
 
 [4]
 On July 3rd, Reliance sent a letter to the FCC requesting an immediate decision on its Short Form application. Since Macfadden had already received FCC approval of its special voting trust, Reliance feared that without FCC Short Form approval Blair shareholders would be pressured to tender their shares to Macfadden. Contrary to Macfadden's position, this letter in no way demonstrates that Reliance believed that FCC Short Form approval was required before it could accept any shares for payment