Vincent M. IAVARONE, Plaintiff,

v.

RAYMOND KEYES ASSOCIATES, INC., Raymond J. Keyes, Kenneth E. McCurdy, Edward Devine, Peter Keyes, Donald Pember, Gerald B. Tracy, Joseph Ward, and Lewis Zickel, Defendants.

No. 90 Civ. 0471 (PKL).

United States District Court, S.D. New York.

March 29, 1990.

728

Shea & Gould (Bertram Perkel, Robert J. Murray, Rory J. Cutaia and Christopher Lometti, of counsel), New York City, for plaintiff.

McCarthy, Fingar, Donovan, Drazen & Smith (James G. Fine and Benedict A. Rabo, of counsel), White Plains, N.Y., for defendants.

## ORDER & OPINION

LEISURE, District Judge:

Plaintiff Vincent M. Iavarone has brought suit against defendants Raymond Keyes Associates, Inc. ("RKA"), a New Jersey corporation, Raymond J. Keyes ("Keyes") (Chairman of the Board of Directors of RKA), Kenneth McCurdy (President of RKA and a member of the Board of Directors), and six other members of the Board of Directors of RKA. Plaintiff Iavarone is a former President and current shareholder of RKA. He alleges that defendants have violated section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), for failure to disclose certain material facts in connection with an alleged tender offer being planned by the Board of Directors of RKA.[1] Iavarone also charges that defendants intend to take action which will violate their fiduciary duties to the shareholders of RKA, will consist of unlawful self-dealing, and will violate New Jersey Statute 14A:7–14.1 which prohibits a

---

1. Plaintiff originally asserted claims under § 10(b) of the Securities Exchange Act, but later withdrew these claims as there had been no purchase or sale of securities.

distribution by a corporation causing the corporation's liabilities to exceed its assets.

The origin of this lawsuit is a transaction proposed by the Board of Directors of RKA to issue new preferred stock to shareholders in return for common stock (the "transaction," or the "proposed transaction"). As will be discussed in detail below, Iavarone alleges that this transaction is unfair and unlawful. The Board of RKA is intending, at its next meeting, to consider and vote on an amendment to RKA's certificate of incorporation which would permit the creation of the new preferred stock. Iavarone has moved for a preliminary injunction postponing the Board's meeting and its vote on the proposed amendment. Defendants have opposed Iavarone's motion, and have cross-moved to dismiss the complaint under Fed.R.Civ.P. 12(b).

## BACKGROUND

In July, 1985, plaintiff Iavarone and defendant Raymond Keyes executed a stock purchase agreement under which Iavarone purchased common stock of RKA at a price of $33.33 per share. Affidavit of Vincent M. Iavarone, sworn to on January 24, 1990, ¶ 4 ("Iavarone Aff."); Affidavit of Raymond J. Keyes, sworn to on March 1, 1990, ¶ 9 ("Keyes Aff."); plaintiff's exhibit A. Keyes states that the philosophy of the stock purchase agreement was to insure that Iavarone, then President of RKA, devoted "full time, undivided services as President of RKA." Keyes Aff., ¶ 8. In November, 1987, Iavarone resigned as President of RKA, soon after being informed by the Board that he would be discharged as President due to Iavarone's involvement in a real estate venture with one of RKA's clients. Keyes Aff., ¶ 10. In February 1988, RKA and Keyes commenced proceedings against Iavarone in state court, alleging that Iavarone purchased the stock in 1985 with no intention of devoting full time and energy to the presidency of RKA, and demanding return of the stock. Keyes Aff., ¶ 8.

At present, there are twenty-five shareholders of RKA. *See* Chart at Keyes Aff., ¶ 3. Raymond Keyes and five members of his family own 66.59% of the outstanding shares. Plaintiff Iavarone owns 12.55% of the outstanding shares. The current President of RKA, defendant Kenneth McCurdy, owns 10.02% of the outstanding shares. The remaining shareholders, who hold 2.5% of the stock or less, are either officers or members of the Board of Directors of RKA, with the exceptions of RKA's general counsel and accountant-consultant, who own approximately 0.5% of the stock each. None of the RKA common stock is registered or traded on a recognized exchange. RKA is a Subchapter S corporation for income tax purposes. Keyes Aff., ¶ 3.

On January 16, 1990, Iavarone received a document from RKA entitled "Notice of Special Meeting and Related Matters" which described an upcoming meeting of the shareholders of the corporation (the "Notice"). The Notice stated that the shareholders will vote at the meeting on a proposed amendment to RKA's certificate of incorporation, which amendment would create a series of preferred stock ranking senior to the common stock with respect to dividends and other distributions. Iavarone Aff., ¶ 6; plaintiff's exhibit B. The Notice contained the text of the proposed amendment, and a three-page description of the proposed transaction whereby common stockholders will be given the opportunity to exchange their shares for the newly issued preferred stock. *See* plaintiff's exhibit B.

Under the proposed transaction, the corporation will allow Keyes and his family to exchange 71% of their shares of common stock for the newly issued preferred stock, and the remaining shareholders to exchange 20% of their common shares. RKA will borrow $3.5 million from Chemical Bank, and in turn lend that money to a newly created Employee Stock Ownership Trust (the "ESOT"). The ESOT will then automatically and immediately purchase the preferred stock from all shareholders at $316 per share.[2] The trustees of the

2. The description of the proposed transaction states that the price of $316 per share is subject

ESOT will be Keyes, Board member Edward Devine who is also a defendant, and another individual. The trustees will be able to vote the preferred shares held in the ESOT, each of which has 1.34 votes while each common share has one vote. *See* plaintiff's exhibit B.

The stated objective of the transaction is to buy out the retiring founder and majority owners of RKA, Raymond Keyes and his family. At the same time, control of RKA will be vested in the new generation of employees, and the corporation will reap the tax benefits of repaying the loan with pre-tax earnings. Keyes Aff., ¶¶ 15–16; Defendants' Memorandum of Law in Opposition to the Motion for a Preliminary Injunction and in Support of the Cross–Motion to Dismiss the Complaint, 3–5. A consultant hired by RKA from the accounting firm of KPMG Peat Marwick states that this type of transaction is "not uncommon," that it is "not unusual" for the retiring leader to be a trustee of the ESOT, and that he is aware of "other ESOP's for closely held companies in which there have been similar disproportions between minority and majority shareholder tender percentages." Affidavit of Ronald M. Siper, sworn to on February 28, 1990, ¶¶ 4–6.

Plaintiff Iavarone challenges the favorable view of the transaction held by defendants. Rather than perceive the transaction as mutually beneficial to both the corporation (shareholders included) and the Keyes family, Iavarone believes that the transaction is a means whereby the Keyes family will squeeze the cash out of RKA for their own benefit, and leave the corporation heavily indebted for many years. Iavarone states:

> [u]pon information and belief, the proposed transaction will result in a windfall to Keyes and his family in an amount in excess of $3 Million Dollars, while leaving the Corporation debt laden, with a negative net worth, and destroying the value of the shares retained by me and the other minority shareholders.

Iavarone Aff., ¶ 9. Iavarone claims that the buy-out price of $316 per share is "arbitrary," and points out that RKA is not even obligated to pay this amount under the terms of the transaction. *Id.*

Plaintiff claims defendants have violated section 14(e) of the Securities Exchange Act, 15 U.S.C. § 78n(e), by making false statements of material facts and omitting to state material facts in connection with the Notice and the proposed transaction. Complaint, ¶ 24. Plaintiff alleges, *inter alia,* that defendants have failed to disclose the effect of RKA's future negative net worth on its ability to remain financially viable; have failed to demonstrate the fairness of the expected buy-back price of the preferred stock of $316 per share; have not shown how RKA will be able to repay the $3.5 million loan to Chemical Bank; and have failed to describe in sufficient detail RKA's current financial posture and the full effect of the transaction on future operations, especially the payment of dividends on common stock.

## DISCUSSION

### I. Plaintiff's Motion for a Preliminary Injunction

In *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969 (2d Cir.1989), the Second Circuit set out the standard for the issuance of a preliminary injunction. The Court stated:

> A preliminary injunction will not issue unless the movant demonstrates both irreparable harm and a likelihood of success going to the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidedly in its favor.

*Id.* at 972 (*citing Fireman's Fund Ins. Co. v. Leslie & Elliott Co., Inc.,* 867 F.2d 150, 150 (2d Cir.1989) (per curiam)). More specifically, the movant must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." *Id.* at 975 (*quoting Consolidated Brands, Inc. v. Mondi,* 638 F.Supp. 152, 155 (E.D.N.Y. 1986)); *accord Kaplan v. Board of Education of the City of New York School*

to adjustment under changing circumstances. *See* plaintiff's ex. B.

*District,* 759 F.2d 256, 259 (2d Cir.1985). "The injury must be one requiring a remedy of more than mere money damages." *Tucker Anthony, supra,* 888 F.2d at 975; *see also Town of Huntington v. Marsh,* 884 F.2d 648, 651 (2d Cir.1989), *cert. denied sub nom. Huntington v. Stone,* — U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

## A. Irreparable Harm

Plaintiff argues that preliminary equitable relief is appropriate in this case, because he and the other minority shareholders have been placed in the unfair position of having to vote on the proposed transaction without sufficient information. Plaintiff claims that equitable relief is necessary to forestall violations of federal law, and to guard the corporation against grave financial harm. Defendants argue in response that even if plaintiff can establish in advance the probability of federal securities law infractions, and the harm that will be caused to the corporation, plaintiff still has failed to show the inadequacy of monetary relief. Defendants point out that Raymond Keyes has an approximate net worth of $5 million, and that if RKA becomes too financially weak to compensate plaintiff for damages at law, the wealth of Keyes might cover any liability.

 A violation of the Williams Act will not trigger *per se* the right to equitable relief; rather, the movant must demonstrate that he will be irreparably harmed by defendants' conduct if not enjoined. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 60–61, 95 S.Ct. 2069, 2076–77, 45 L.Ed.2d 12 (1975); *General Aircraft Corp. v. Lampert,* 556 F.2d 90, 96–97 (1st Cir. 1977); *International Banknote Co., Inc. v. Muller,* 713 F.Supp. 612, 619–20 (S.D.N. Y.1989) (Wood, J.); *Schmidt v. Enertic Corp.,* 598 F.Supp. 1528, 1540–44 (S.D.N.Y. 1984) (Ward, J.). In *Rondeau,* the Supreme Court held that a tender offeror's failure to make a timely Schedule 13(D) filing, alerting solicitees of his intention to take control of the target corporation, did not cause the irreparable harm necessary for preliminary injunctive relief. *Rondeau, supra,* 422 U.S. at 57–60, 95 S.Ct. at 2075–77. The offeror had made the required filing after the statutory deadline, and thus the case was not one where "'there exists some cognizable danger of recurrent violation.'" *Id.* at 59, 95 S.Ct. at 2076 (*quoting United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953)); *see also United States v. Pent–R–Books, Inc.,* 538 F.2d 519, 525 (2d Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). But the Court made clear that traditional principles of equity applied, and that the Williams Act was not a prophylactic measure which could be used to enjoin all offending transactions regardless of circumstances. *Rondeau, supra,* 422 U.S. at 59–65, 95 S.Ct. at 2076–79; *see also Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir.1980).

 In the context of section 14(e) of the Williams Act, this Court has held that a tender offer should not be enjoined when the proposed transaction will not cause "unravelable" harm which cannot be adequately calculated and compensated for by money damages. *Schmidt, supra,* 598 F.Supp. at 1544; *see also Koppers Co., Inc. v. American Exp. Co.,* 689 F.Supp. 1371, 1382 (W.D.Pa.1988). This Court agrees with Judge Ward's conclusion in *Schmidt* that *Jackson Dairy, supra,* 596 F.2d 70, created an unmistakably clear requirement in this Circuit that movants for equitable relief must show irreparable harm, noncompensable in money damages, in all circumstances in which an injunction is requested. *Schmidt, supra,* 598 F.Supp. at 1539–42. The requirement of irreparable harm has been consistently maintained by the Second Circuit to date. *See discussion supra.* Thus, when the corporate entity will survive the proposed transaction, and will not disappear through a merger or otherwise and thereby become immune to liability, courts should refrain from entering injunctive relief. *Schmidt, supra,* 598 F.Supp. at 1544.[3]

---

**3.** During debate over the Williams Act, Congress rejected all legislative proposals which would

In the case at bar, equitable relief is not appropriate, as money damages will fully compensate plaintiff if he shows at trial or otherwise that violations of section 14(e) of the Williams Act harmed his ability to make an informed choice with regard to the proposed transaction. RKA will still be in existence after the transaction, thereby allaying the concerns expressed by Judge Ward in *Schmidt* concerning the possibility of an "unravelable" post-transaction situation. The fact that money damages may be "difficult to quantify" does not necessitate equitable relief. *Schmidt, supra,* 598 F.Supp. at 1544.

In exercising discretion whether to enter equitable relief, courts should be guided by the circumstances of each case, rather than by inflexible rules. In the case at bar, the Court may do more harm by enjoining the proposed transaction than by letting it proceed. The upcoming vote may show that a majority of RKA shareholders, being insiders and possessing full information, are fully supportive of the transaction. The Court does not see the wisdom of enjoining the vote, and potentially derailing a carefully planned reorganization, merely for the benefit of one shareholder who can be fully compensated through post-transaction litigation.

## B. Likelihood of Success on the Merits

Having found no irreparable harm to plaintiff due to the proposed transaction, the Court need not consider plaintiff's likelihood of success on the merits. *See Schmidt, supra,* 598 F.Supp. at 1547. The Court will, however, discuss the merits of the case with regard to defendants' motion to dismiss the complaint under Fed.R.Civ.P. 12(b).

## II. Defendants' Motion to Dismiss

The well-known standard in applying Rule 12(b) dictates that a district court should deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote and citations omitted). "The allegations in the complaint, moreover, must be liberally construed." *Rauch v. R.C.A. Corporation,* 861 F.2d 29, 30 (2d Cir.1988) (*citing Dahlberg v. Becker,* 748 F.2d 85, 88 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985)). The purpose of a motion to dismiss under Rule 12(b) is to assess the legal feasibility of the complaint, not to weigh the evidence which the plaintiff offers or intends to offer. *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). The district court should not grant the motion simply because the possibility of ultimate recovery is remote. *Id.* at 779 (*citing Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)).

## A. Williams Act Claims

### i. Status of Proposed Transaction

The principal issue disputed by the parties is whether the proposed transaction is a "tender offer" and thus covered by the provisions of the Williams Act. Section 14(e) of the Williams Act reads as follows:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

---

have caused excessive delay in the tender offer process, thus favoring solicitees. *Edgar v. Mite Corp.,* 457 U.S. 624, 632–39, 102 S.Ct. 2629, 2635–39, 73 L.Ed.2d 269 (1982); *Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757, 760 (2d Cir. 1983). In the case at bar, the Court believes

that enjoining the proposed transaction would cause excessive delay in the process whereby the shareholders of RKA will decide upon the proposed transaction. This delay will unduly favor plaintiff to the detriment of other shareholders of RKA who may favor the transaction.

15 U.S.C. § 78n(e). The statute does not attempt a definition of a "tender offer," but the generally held view is that this omission was deliberate, allowing courts and the Securities and Exchange Commission the flexibility to define the term. *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 56 (2d Cir.1985).

The Second Circuit has held that a "tender offer" should be defined in the context of the policies and concerns of the Williams Act. *Hanson Trust, supra,* 774 F.2d at 57. The Court held that

> whether a solicitation constitutes a "tender offer" ... turns on whether, viewing the transaction in the light of the totality of the circumstances, there appears to be a likelihood that unless the pre-acquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them.

*Id.;*[4] *see also Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 848 (2d Cir.1986), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986). Thus courts should look to whether the particular class of persons affected needs the protection of the statute. *Hanson Trust, supra,* 774 F.2d at 57.

■ The *Hanson Trust* Court also made reference to an eight-factor test used by some courts in determining the existence of a tender offer. *See id.* at 56–57 (*citing S.E.C. v. Carter–Hawley Hale Stores, Inc.,* 760 F.2d 945, 950–53 (9th Cir.1985); *Wellman v. Dickinson,* 475 F.Supp. 783, 823–24 (S.D.N.Y.1979), *aff'd,* 682 F.2d 355 (2d Cir. 1982), *cert. denied sub nom. Dickinson v. S.E.C.,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983)). These factors, which indicate the existence of a tender offer, are: (1) active and widespread solicitation of public shareholders of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at premium over market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the offer of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only for a limited period of time; (7) offeree subject to pressure to sell his stock; and (8) public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target company's securities. *Hanson Trust, supra,* 774 F.2d at 56–57. The Second Circuit ruled that it would be "unwise and unnecessary" to use the eight factors as a "mandatory litmus test," but that many of the factors would be "relevant" to a court's determination. *Id.* at 57.

■ In light of these considerations, the Court finds that the proposed transaction is a tender offer under the Williams Act, and that therefore the disclosure requirements of section 14(e) apply. The proposed transaction involves widespread solicitation for the stock of the company amongst shareholders; a substantial percentage of the issuer's stock has been solicited (over 50%); the offer price is firm, and appears to be a premium above market; the offer is only open for a limited period of time; and the shareholders were subjected to pressure to sell in that they were given only a limited amount of time in which to make a decision. Based on this analysis of the transaction, the Court views it as a tender offer.

■ Though it is unusual to apply the provisions of the Williams Act to the stock transactions of small companies with a limited number of shareholders, the caselaw clearly gives courts the discretion to apply the Act if its protections are needed. *See L.P. Acquisition Co. v. Tyson,* 772 F.2d 201 (6th Cir.1985); *Astronics Corp. v. Protective Closures Co., Inc.,* 561 F.Supp. 329 (W.D.N.Y.1983). The Second Circuit has made clear that the true touchstone of the analysis is whether it is likely that solicitees will be given sufficient information to make a sound decision. *Hanson Trust, supra,* 774 F.2d at 57. Non-application of the Williams Act must be premised on all

---

**4.** *Hanson Trust* dealt with § 14(d) of the Williams Act rather than § 14(e), but the Court believes that the analysis is fully applicable to the case at bar.

shareholders being sufficiently "inside" the corporation to make disclosure requirements superfluous. Plaintiff Iavarone is not currently an insider with respect to the financial status of RKA, and he lacks what the Court views as crucial data on the benefits and dangers of the transaction. The fact that Iavarone may be the *only* shareholder to lack access to such information makes this case peculiar, but it should not prevent him from benefitting from a statutory scheme whose object is to minimize uninformed decisionmaking by corporate shareholders.

### ii. Sufficiency of Disclosure

Both the Supreme Court and the Second Circuit have held that the purpose of the Williams Act is to provide for full and fair disclosure prior to tender offers, and not to favor one side or the other in a tender offer dispute. *Rondeau, supra,* 422 U.S. at 58–59, 95 S.Ct. at 2076; *MacFadden Holdings, Inc. v. JB Acquisition Corp.,* 802 F.2d 62, 66–67 (2d Cir.1986); *Hanson Trust, supra,* 774 F.2d at 60. The Second Circuit has interpreted the disclosure requirement of section 14(e) as indicating Congressional intent " 'to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool [for either side]....' " *MacFadden Holdings, supra,* 802 F.2d at 66 (*quoting Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969)). Thus, while a shareholder does have a right under the Williams Act to "adequate information" on which to base a decision whether to accept the tender offer or not, the statute "was not intended to remove all pressure or uncertainty from this inherently volatile ... situation...." *MacFadden Holdings, supra,* 802 F.2d at 66.

The Supreme Court has held that a fact is "material" under the Williams Act "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2126–32, 48 L.Ed.2d 757 (1976); *see Data Probe Acqui-*sition Corp. v. Datatab, Inc., 722 F.2d 1, 5–6 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984); *Seaboard World Airlines, Inc. v. Tiger Int'l, Inc.,* 600 F.2d 355, 360–61 (2d Cir. 1979); *Schmidt, supra,* 598 F.Supp. at 1540. Plaintiff in the case at bar argues that defendants have failed to disclose material information concerning the proposed transaction. The Notice sent to all shareholders announcing the Board meeting and the shareholder vote on the transaction contained a brief description of the transaction and a text of the proposed amendment. In the course of litigating the pending motion, defendants have produced the 1988 and 1989 Annual Reports of RKA and an appraisal report on the estimated price of $316 per share of preferred stock, as calculated by the independent accountants based on RKA financial data from 1985 through 1988. Iavarone claims that disclosure has been insufficient, arguing that nowhere have defendants disclosed the foreseeable problems facing RKA in attempting to pay off the debt. Iavarone emphasizes that corporate earnings have declined over the past several years, and even if earnings now stabilized, RKA still would not have sufficient cash flow to service the debt.

In parsing a motion under Fed.R. Civ.P. 12(b), the Court must determine the legal sufficiency of the complaint, rather than weighing the evidence as put forward by the parties. Plaintiff has adequately stated a cause of action under section 14(e) of the Williams Act for material omissions and misrepresentations in defendants' disclosures to date. At this juncture in the litigation, the Court need only state that it cannot find the complaint insufficient as a matter of law. The Court declines to detail what it believes adequate disclosure to consist of under the circumstances. The Court will only be in such a position after discovery and the development of a more complete factual background in this case.

### B. New Jersey Statutory Claims

Plaintiff Iavarone claims violations of New Jersey Statute 14A:7–14.1, which pro-

hibits corporations from making distributions if the result will be that the corporation's total liabilities will exceed its total assets—i.e., that the corporation will have a negative net worth. The test of the statute defines "distribution" as

> a direct or indirect transfer of money or other property (except its own shares) or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a dividend, a purchase, redemption or other acquisition of its shares, or otherwise.

New Jersey Statute 14A:7–14.1(1). The Commissioners' Comment—1988 Amendments states that "a broad and open-ended definition [of "distribution"] would better protect creditors."

 Defendants characterize the transaction as merely a share exchange and thus outside the scope of the statute. Corporate transactions may always be interpreted in more than one way. The Court will only be in a position to characterize properly the proposed transaction and to decide the applicability of the New Jersey statute after further development of the facts of the case and more focused legal briefing by the parties. On a preliminary motion to dismiss pursuant to Fed.R.Civ.P. 12(b), the Court is unwilling to hold as a matter of law that the New Jersey statute does not apply to the case at bar.

### C. New Jersey Common Law Claims

 Plaintiff has made claims against defendants based on the New Jersey common law of fiduciary duty, corporate self-dealing, and contract. As with the New Jersey statutory claim, the Court cannot rule, under the standards of Fed.R.Civ.P. 12(b), that plaintiff has not stated a claim for relief which may be granted. The merits of plaintiff's common law claims will only become evident upon full development during discovery and at trial.

### CONCLUSION

Plaintiff's motion for a preliminary injunction is denied. Defendants' motion to dismiss the complaint pursuant to Fed.R. Civ.P. 12(b) is denied.

SO ORDERED.